### In re EILERS MUSIC HOUSE (two cases).

### OREGON EILERS MUSIC HOUSE v. SITTON (two cases).

(Circuit Court of Appeals, Ninth Circuit. February 14, 1921.)

Nos. 3529, 3548.

1. Bankruptcy ⚖440—Decision reviewable only by appeal.

Where a decision of a District Court involves questions of both fact and law, it is reviewable by appeal, under Bankruptcy Act, § 24a (Comp. St. § 9608), and not by petition for revision.

2. Bankruptcy ⚖288(1)—Adverse claim must have substantial basis to exclude summary jurisdiction.

A court of bankruptcy held to have jurisdiction in a summary proceeding to order assets which are a part of the general estate of the bankrupt turned over to its trustee, notwithstanding an adverse claim thereto by another corporation, which has been acting as a subsidiary of bankrupt, and all of whose stock is owned by bankrupt.

3. Bankruptcy ⚖140(½)—Assets held by subsidiary corporation part of estate.

Where bankrupt, which was a wholesale and retail dealer in musical instruments and merchandise, with a number of branches, purchased the stock of another corporation doing a retail business, and after operating it separately for a number of years moved its business into its own establishment, where it took over the retail branch of bankrupt's business and a large amount of its merchandise, for which bankrupt received no consideration of value, and was thereafter held out to creditors as a subsidiary or agency of bankrupt, the property and assets held by such corporation held a part of bankrupt's estate.

Ross, Circuit Judge, dissenting.

Petition to Superintend and Revise Decree in Bankruptcy of and Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

In the matter of the Eilers Music House, bankrupt; H. W. Sitton, trustee. On appeal and petition to revise by the Oregon Eilers Music House. Petition to revise dismissed. Affirmed on appeal.

This matter arises out of the bankruptcy of Eilers Music House, an involuntary bankruptcy proceeding instituted in February, 1918, with respect to the Eilers system of houses in certain fields of mercantile business. In the matter of Eilers Music House, a corporation, bankrupt, petition was filed in the District Court to require surrender and delivery of bankrupt's property, and thereupon order to show cause was issued and served upon the Oregon Eilers Music House. The Oregon Eilers Music House replied, and after preliminary motions the court made an order of reference of the proceedings to a special master, who thereafter filed findings and conclusions, and recommended a decree requiring the surrender of the assets of Oregon Eilers Music House to the trustee in bankruptcy of Eilers Music House. To the report of the master Oregon Eilers Music House filed exceptions, and thereafter the District Court in bankruptcy affirmed the report of the special master and by decree awarded possession of the assets of Oregon Eilers Music House to the trustee of Eilers Music House, bankrupt. By petition to superintend and revise the decrees, and by appeal, Oregon Eilers Music House asks reversal of the order of the District Court. Inasmuch as the issues and the evidence pertaining thereto are so fully stated in the report of the special master, we append such report, which is as follows:

"It is claimed by the petitioner that Oregon Eilers Music House is an agent or subsidiary of the bankrupt. It is alleged that Eilers Piano House, the predecessor of the bankrupt, and, indeed, the bankrupt, under another name, in the year 1908, purchased Graves & Co., a corporation, acquiring its capital stock through officers and directors of Eilers Piano House in trust for the corporation, and that the Music House has ever since owned and possessed Graves & Co., now Oregon Eilers; that, while Oregon Eilers is doing business as a separate corporation, it is nevertheless, and in fact, an agent or representative of the bankrupt, and should be required to turn over the assets in its possession to the trustee.

"Oregon Eilers Music House totally denies the allegations in the petition as appertains to the ownership of Oregon Eilers, claiming that the bankrupt corporation, long prior to bankruptcy, disposed of all the stock of Graves & Co., or Oregon Eilers, and disclaims that Eilers Music House ever owned Oregon Eilers, or any part of it. Extensive hearings have been had upon the issues described and a large amount of testimony has been taken. Prolonged analysis of this testimony, much of which is immaterial, would result in making this report burdensome, so the facts found will be stated in narrative form, together with such inferences and conclusions as I deem them to warrant. For convenience the bankrupt, Eilers Music House, will herein be called 'Music House,' Oregon Eilers Music House, 'Oregon Eilers,' and the Graves Music Company, or Graves & Co., 'Graves Company.'

"Prior to the year 1902, H. J. Eilers, familiarly known as Hy. Eilers, A. H. Eilers, and S. J. McCormick were engaged in the business of selling musical instruments in Portland, Or., the firm being known as Eilers, McCormick & Co. In that year these individuals incorporated their business under the name of Eilers Piano House, and continued to operate as such until the year 1910. They were the sole owners of the business, except as a few shares of stock became scattered now and then among a few of their employees, associates, or relatives. In the main, H. J. Eilers was the owner, manager, and directing head of this corporation. It transacted a large business in the piano field, both wholesale and retail, and for the greater portion of the time, up to and including 1910, and as far as 1912, did an exceedingly prosperous business according to the books, and as the testimony developed.

"As appears by the minutes of the Piano House, in February, 1908, it purchased Graves & Co. in accordance with the desires of its owners, A. H. and S. J. Eilers and S. J. McCormick, and agreed to pay for the stock of that company $48,000, paying $1,000 in cash and executing 47 $1,000 notes. The capital stock of Graves & Co. was thereupon taken over in the name of the two Eilers and McCormick, as the minutes state, in trust for the Piano House. H. J. Eilers took 50 shares, A. H. Eilers and S. U. McCormick 24 shares each, and 1 share each was apportioned to G. A. Hoffman and F. W. Graves; thereafter the Piano House, or its stockholders, operated the Graves Company

business. It was conducted, as it had been theretofore, in the same location, and it did the same general character of business down to the year 1916. There is no doubt that the Piano House in the first instance paid the consideration due to Graves Company for the transfer. It pledged the sum of $94,000 of its liquidated assets to the stockholders of Graves Company as collateral to secure the payment of its $47,000 notes. It went its security at the banks, guaranteed the payment of its real estate rental leases and other obligations, and the transaction was entered upon the Piano House books as a purchase by it.

"In April, 1910, the Music House, the bankrupt, came into existence through the initiative of the same individuals, H. J. and A. H. Eilers and S. J. McCormick, and it thereupon took over all of the assets and assumed all the obligations of the Piano House. Its capital stock was apportioned to, or taken by, the same individuals, substantially in its entirety. During this time, as heretofore stated, the Piano House was in a prosperous condition, entirely solvent, and was at all times able to meet and discharge its obligations to all its creditors, among whom were the stockholders of Graves Company, since payment of the purchase price due on that transaction had not been completed when the Music House came into existence. The same solvent condition existed in February, 1908, when that purchase was made. It is asserted by Eilers and his associates, and I find it is proven by the testimony, books of the bankrupt, and documents in evidence, that while, apparently, the purchase of Graves & Co. was made to appear, by the minutes of the bankrupt and method of bookkeeping, as a purchase by the Music House of the Graves & Co. corporation, it nevertheless was purchased by and in the interests of the individual stockholders, and that the alleged purchase by the Piano House or the Music House was a paper transaction altogether. The testimony had developed the fact that the corporation was used by these stockholders as their banking house. Whatever individual income they possessed or acquired was deposited with the corporation, for which they were given credit; dividends were frequently declared from the profits made by the corporation and these stood on its books to their credit in large sums. They checked through the corporation in payment of their private individual obligations and all such payments were debited against them upon its books. In fact, the corporation was their bank; the testimony showing that none of the three carried any individual deposit in any bank.

"It further appears that the payment of the obligations due the stockholders of Graves & Co., as they came due, were immediately charged on the books of the bankrupt to the account of the several stockholders. For example, whenever one of these notes of $1,000 and accumulated interest was paid by the bankrupt with its check, the amount of such payment was uniformly charged upon its books against the accounts of the several stockholders in proportion to the amount due from each upon such payment. Memoranda of these charges are found running through what is termed B. O.'s, C. O.'s, or D. O.'s. These payments were entered through what was known on the books of the company as Graves Music Company Investment Account, so that, if the bankrupt was called upon to pay, let us say, $1,175 to the stockholders of Graves & Co. upon a note falling due for that amount, including interest, there would be made a memorandum of the transaction, to be posted in the journal, charging A. H. Eilers, S. J. McCormick, and H. J. Eilers with their proportion of that payment and the investment account would be credited therewith. Such practices continued until the said purchase price was fully paid, and hence there can be no reasonable doubt that Eilers and his associates at all times considered that they, and not the corporation, purchased the stock of Graves & Co., and that they merely used the Music House as a medium to accomplish the transaction. Furthermore, neither the stock or assets of Graves & Co. were at any time carried upon the books of the Music House as an asset, as was done in the case of subsidiary concerns and corporations, as to the ownership of which by the Music House there has never been any contention. Hence I find as a fact that, if it was permissible for the stockholders of the Music House, while the corporation was entirely solvent, and while they had upon its books credits to an extent more than

sufficient to cover the payments made by it on their behalf and charged back to their private accounts, to make this purchase for themselves in contradiction to the recorded acquisition of the same in trust for the corporation, as declared in its minutes, it was accomplished by what took place at the time.

"When the Music House came into existence, in 1910, it was called and considered by those interested as a consolidation, that is to say, Eilers and his associates had gradually spread out, since the original incorporation of the Piano House in 1902, until they had branches in various cities throughout the Pacific Coast, variously known as Seattle Eilers Music House, San Francisco Eilers Music House, Boisé Eilers Music House, Bellingham Eilers Music House, and so on. These branches were feeders to the parent house in Portland. They were owned by the Music House, and entirely under its domination and control, or the control, in short, of H. J. Eilers, the managing director of the Music House. They may be appropriately termed a part of the Eilers system, and, by the ownership and control of the corporate stock, these various businesses were directed and manipulated, acquired, and disposed of, in the interest of and as a part of the Eilers fortune. In the main, the Music House purchased from wholesalers and manufacturers all the goods sold by the various subsidiaries, who in turn purchased from the Music House, made reports and remittances thereto, and cleared their paper through it. But I find no evidence in the record that indicates the Graves Company business, during these years, was thus allied to the Music House.

"As thus developed, the Music House continued to prosper and grow, up to about the beginning of the year 1913, when its first financial difficulties appeared, due to its inability, by reason of changed banking policies throughout the country, to expeditiously clear or dispose of its paper, or secure loans through or from the banks in the liberal allotments it had theretofore been privileged to do, and its business as a consequence began to show a loss, so much so that in the year 1913 it became necessary for it to pass into the hands of a creditors' committee, who advised and directed a scheme of partial liquidation. The control of the creditors' committee continued for something more than a year, during which time a large amount of indebtedness due to banks throughout the Pacific Coast was paid off, and it was hoped that reviving business conditions upon the coast would relieve its failing symptoms. Such, however, was not the case, and the evidence discloses, very clearly I think, that by the fall of 1916 the Music House became and was insolvent, and so continued down to the time it was declared bankrupt in February, 1918. It may be true that on the face of its books, bookkeeping values alone considered, a solvent condition appeared, but liquidation by disposition of the assets at a fair market value could by no means have been accomplished at any time within 18 months preceding actual bankruptcy, as administration has since demonstrated to a certainty.

"In the interval between 1913 and the fall of 1916 the Music House operated under a lease the entire premises at Broadway and Alder streets, in Portland, known as the Megley-Tichner Building. It occupied for its own purposes and conveniences commodious quarters therein. Graves & Co., during the same period, conducted its business in its location, Fourth and Morrison streets, also under a lease. For the greater portion of the time mentioned the latter corporation had been nominally operating under the direction of F. W. Graves, but Hy. Eilers was the real boss, as he was in every Eilers establishment. At this time, to be exact, October, 1916, a material change in the relationship of these two concerns, the one to the other, was accomplished, as I shall now detail at some length. The Music House was then insolvent, and engaged in a persistent effort to postpone absolute collapse. The then financial condition of the Graves Company does not distinctly appear, but I believe it to have been in little better condition, very likely in a failing condition. This is to be noted by the fact that its leasehold was a fixed liability, which it found burdensome, and of which it was at all times seeking strenuously to be rid, nor has it been claimed by any one that its business was then enjoying any marked degree of prosperity.

"Mr. F. W. Graves, the founder of this institution, a man of wide and useful experience in musical trade, and in whom undoubtedly reposed intimate

knowledge of its affairs, thus reflects his opinion of it: 'My private reason [for approving the change] is that I was afraid Graves Music Company would go busted, and I did not want to see it go bust; so I was willing to have the name changed to Eilers, and that would save our name [Graves] from the maelstrom, if it should come, and I was fearful that it might come, and so that was my reason, and as a director I voted for it.' The changed aspect, relation, and operation of these two concerns from this point on, as will now be noticed, were the result of the design and policy of Hy. Eilers as the principal stockholder and the sole managing director of both. His associates concurred merely as of course, and as a matter of form.

"In August, 1916, supplementary articles of incorporation of Graves Company were filed in the office of the Secretary of State, by which the name was changed to Oregon Eilers Music House. Between that date and October 27, 1916, Graves Company, henceforth Oregon Eilers, was moved, together with its operating force, business, and assets, whatever they were, almost in the entirety into the Music House Building at Broadway and Alder. Fourth and Morrison was not entirely abandoned at that time but what remained, and the attendant business, were insignificant. The small portion retained was so only because they had not succeeded in disposing of the leasehold. Subsequently it was practically abandoned. The reasons for and the benefits sought to be obtained by this move, as effecting generally the Eilers' business, are well explained by Hy. Eilers: 'We found in our liquidating operations that Portland had the greatest amount of assets in use so far as the Eilers Music House was concerned; then, when the chance came, as we thought, to rent the Fourth street to the Southern Pacific, as I have already explained, naturally we hit on the scheme of saddling the conduct of the retail business upon the Graves Music Company. We thought we had a first-class valuable leasehold on Broadway, and I think still we had, and we wanted to keep that; we had induced the Spaldings to take the corner for $500 a month; then we figured that if we could get Graves Music Company in there to help pay another $500 a month that we could splendidly keep that thing afloat, and at the same time concentrate the entire business into one place; Eilers Music House would get relief from the pay roll and operating expenses of carrying on the business, which would all be taken over by Graves Music Company, and in that way all the collections coming into Eilers Music House would serve to help pay off indebtedness, or to carry out the liquidating process. Now, then, in this work Eilers Music House had a lot of dormant or fixed assets. If Eilers Music House went out of business altogether, like it had done in many places, that sort of stuff would become of variable value, but by having the Graves Company certify in its corporation name, make it Oregon Eilers Music House, they could utilize all of these assets in its own current operations, and besides, of course, would fall heir to the Eilers patronage and following in the city; that was the way and that was why the $45,000 worth of various assets * * * were transferred in the manner that has already been set forth.'

"Accordingly, Mr. Eilers caused to be turned over by the Music House to Oregon Eilers, property in nature and value as follows: [Here follows itemized list of musical instruments, store equipment, etc., of the value of $45,-000.] It thus appears clearly, from the nature and description of this property, that it was the intention Oregon Eilers should step into the shoes of the Music House, obtain the advantage of and value in the advertising campaigns which the Music House had conducted for many years, should adopt its advertising signs, its objects of art, ornaments, and other furnishings, and assume the character appropriate for the conduct of the entire retail trade. Needless to say, the advantages and values thus obtained by Oregon Eilers in assumption of the Eilers trade-name, its good will and advertising were as valuable, perhaps more valuable, than the very substantial quality and proportion of assets it thereby accumulated.

"This transaction never was approved by the board of directors of the Music House, so far as the minutes disclose, though it seems to have been run through its books as a sale to Oregon Eilers in consideration of the issuance to it of $45,000 of the capital stock of the latter. No other, different, or addi-

tional consideration passed. The value of this capital stock was problematical; it could not, in any event, have been very great. It does not appear ever to have been of any value to the Music House and is of no value to its trustee. Oregon Eilers at that time had an authorized capital of $200,000, of which $195,000 was issued, and no visible assets existed that anywhere near justified such a capitalization, or set the value of the stock to anything like par. This eliminated the Music House from the retail field in and about Portland as a competitor of Oregon Eilers; it reduced its appreciable assets to the extent of $45,000, to say nothing of its loss as a selling medium, gained through long years of extensive and expensive advertising, and thus entirely swept away its earning ability in that field, whatever it was. At the same time it served to increase the assets of Oregon Eilers to the extent of $45,000, in real, live property, and put it in position to be urged forward by its owners.

It is claimed by Hy. Eilers that, before he executed this change or consolidation, he advised the creditors of what was in contemplation and that much correspondence passed concerning it. Whether such creditors objected, or were in a position to object, or whether, if they had, it would have availed them, does not appear. However this may be, it does appear that on December 18, 1916, Mr. Eilers indicted a letter to his creditors (and by creditors I mean wholesalers), the retention of whose confidence meant the breath of life to his institutions, in which he assumed to inform them fully and at length of the conditions in the trade along the Pacific Coast, the progress made by the Music House toward liquidation, the attendant difficulties, the urgent necessity for further extensions, of his hopes of ultimate success, and finally of the functions of Oregon Eilers as an assistant in the enterprise. The effect of this letter, it seems to me, could not be otherwise than to cause the creditors to catalogue Oregon Eilers as a unit or constituent part of the entire Eilers organization. I quote:

"'* * * Of late we have incidentally been asked to look into the situation with some of the other houses on the Coast, and we can say without fear of contradiction that ours are in better condition, and we manage our affairs in a better manner, and have been getting along, better, than any of them; but we ought not to be expected to attempt the impossible. Where manufacturers that we paid off have extended credit to others on the Coast, they cannot find that they have gained anything. After all, our institution, what there is left of it, is the best qualified merchandising institution along the coast, and while no manufacturer is looking for output now, it cannot be that situation will continue with them very long. Eilers Music House will be needed by many a manufacturer as definitely as Eilers Music House needs assistance of these manufacturers now. So far as the Northwest is concerned, it is practically in shape as reported heretofore, although the establishment of the Oregon Eilers Music House has proved a very difficult problem, because the selling could not be gotten under way. It has been a matter of several months of very close and hard work to get the institution into shape so that it would carry the load, but this result we are confident has now been achieved. It is proposed, during the ensuing year, to have the Music House proceed without much attention from the undersigned, with Mr. F. W. Graves in charge of the Oregon Eilers Music House, assisted by Mr. McCormick and Mr. Mainer, and with A. E. Barnickel and Mr. Cornell and a corps of assistants looking after the residuary interests of the Eilers Music House. Eilers Music House proper must keep on doing business in a wholesale way here in order to show earnings, to take care of shrinkages, and also to produce enough paper to take care of collections and cancellations of the paper held as collateral by some of the banks. The work is well organized and well under way. Thus, promptly on the 1st of January, the writer will be left free to take hold of the work in California, which can and will undoubtedly be made to pay and pay handsomely, provided it is determined to go ahead; that is, provided some way is found now to retain the unsecured credit now remaining in the business for some definite time.'

"In January, 1917, Hy. Eilers went East, and while there entered into agreements with his creditors, or some of them, covering the retirement of

old obligations, and in some detail a plan whereby the Eilers House should obtain new goods for future operations. Mr. Eilers produced at the trial of this matter the contract negotiated by him with the American Piano Company, which he states is typical of the others, as follows:

" 'Résumé of Agreement between Mr. Hy. Eilers, Mr. H. S. Irvine, and the American Piano Company.

" 'It is understood and agreed that old indebtedness notes of the Eilers Music House shall be retired as follows: One-half (½) of the amount of notes falling due shall be in customers' lease paper bearing six per cent. (6%) interest and not running longer than thirty (30) months, and one-half (½) to be paid by renewal notes, the first of which notes shall mature on August 18, 1918, and subsequent renewal notes to mature each thirty (30) days thereafter. Such settlements shall be in the hands of the American Piano Company prior to date of maturity of old indebtedness notes: It is distinctly understood that renewal notes are not subject to re-renewal. Customers' paper shall be guaranteed and absolutely assigned under form of assignment agreeable to the American Piano Company.

" 'Music Account.—All music rolls for the various Eilers Companies shall be purchased by the Eilers Music Company of San Francisco, and the American Piano Company will accept their five (5) months note in settlement of monthly purchases, such notes to bear interest at six per cent. (6%) and are to be met at maturity without renewal. The Oregon Eilers Music House, it is understood, will control operations in the north for Portland and Spokane, and purchases for these points shall be made by the Oregon Eilers Music Company of Portland, to be settled for under trustee terms or cash promptly within sixty (60) days of date of shipment. It is also understood that purchases for Boise, Idaho, shall be made by and through the Oregon Eilers Music Company. Trustee settlement shall conform to terms and conditions of the Trustee Account. In the south it is agreed that the Eilers Music Company shall operate from San Francisco, and their purchases from the American Piano Company shall be on a consignment basis, with interest after thirty (30) days, providing for goods to be paid for when sold and settlements to be made in trustee paper: Eilers Music Company of San Francisco agreeing to sign a contract with J. R. Shale, Trustee.

" 'In consideration of the above agreements, the Eilers Music Company agrees toward the end of the year, in November and December, to make their settlements with the American Piano Company in as much less than sixty (60) days as possible. In general, it is further agreed that, on the return of Mr. Eilers and Mr. Irvine to San Francisco, they will promptly check up all consigned goods on hand unsold and report the same in detail, which the American Piano Company will reconsign as of January 1st with interest accumulated, starting new accounts to cover. All goods sold shall be promptly settled for by the Eilers Music Company of San Francisco or by other Eilers Houses, to which such pianos were shipped. All settlements in the future are to be made promptly as agreed; no discounts to be allowed beyond regular discount period provided, to wit, sixty (60) days.

" 'Customers' paper purchased by trustee and customers' paper purchased in retiring old indebtedness notes shall not extend beyond thirty (30) months, and is to bear interest at six per cent. (6%) per annum. It is further agreed that collections to be made by Eilers Music House on customers' paper purchased in retiring old indebtedness notes shall be remitted promptly each month as due, with detailed statements, covering same. Repossessions wil be exchanged promptly for paper of like amount and like time. In purchasing paper in settlement of old indebtedness notes, accumulated interest shall not be considered in the value or face of paper. [Signed] For E. M. H. [Eilers Music House], per Hy. Eilers, Pres. [Signed] For E. M. Co. [Eilers Music Co.], Hy. E. [Hy. Eilers], Dir. American Piano Company, [Signed] by J. N. Shale, Supt.'

"After a careful reading of this contract there can be discerned therefrom no thought existing in the mind of either contracting party of any division of

separation between or among the many Eilers enterprises. If I can under-stand the import of plain language, the implication passed out to these creditors in the documents above quoted is direct and positive that, although 'the establishment of Oregon Eilers Music House has proved a difficult problem,' it had been accomplished and by the contract it stepped into the breach to do its share in the rescue work; indeed, was to 'control operations in the North for Portland and Spokane.' What were the operations there referred to? As a distinct and independent organization, Oregon Eilers had no interest in the general scheme thus outlined for the revivification of this business, and had no right whatever to control for its own self and profit operations which then belonged in equity and good conscience to the credi-tors of Eilers Music House. As an agent, instrument, adjunct, or branch of Eilers Music House, however, it had a vital interest and a right to 'control operations,' if that was deemed by the parties expedient for the interest of all.

"Everything being thus set for a fresh start, as it were, the manner of doing business now becomes interesting and important as shedding light upon the aims and intentions of those in control, as outlined by the testi-mony of Mr. Eilers and the contracts and engagements into which he entered with the creditors. As stated, Oregon Eilers had now been planted, root and branch, in the Eilers home garden at Broadway and Alder. Much testi-mony was taken touching the interdependency of all corporate operations there as reflecting the existence of several units so organized, operated, and controlled as to constitute a cohesive whole; a business dynasty, as it were, with the parts severally functioning, but all to the same purpose, and all answerable to the same supreme authority. This character of evidence places in undisputed command of each and every interest Hy. Eilers, the creator thereof and the chief votary and proprietor. His position as such was so understood by every one connected with the organization. As one witness, when asked on cross-examination by whom Oregon Eilers was organized, replied: 'A. Well, I suppose by Hy. Eilers. He organized every-thing up there. Q. How did Hy. Eilers organize it? A. He probably told them to organize it. · That is the way he organized all his companies. It was a one man concern.'

"A clear understanding of the manner in which the Eilers business was conducted, as applied to the relation of any part to the whole, may be had from the testimony of Mr. A. E. Barnickel, who was connected with the Music House in one capacity or another from the date of its organization in 1902 to the date of the failure in 1918. From his testimony, as well as that of others, these facts are established:

"In October, 1916, there were in existence and doing business the follow-ing Eilers corporations: Eilers Music House (the parent corporation), Oregon Eilers, Eilers Talking Machine Company, all situate in the Eilers building at Broadway & Alder; Spokane Eilers, Boise Eilers, Tacoma Eilers, and Eilers Music House of California. There may have been others, but of this many we are sure. Of the above, Eilers Music House owned the cap-ital stock of Eilers Music House of California, Boise Eilers, Tacoma Eilers, and Eilers Talking Machine Company. It owned one-quarter of the capital stock of Oregon Eilers. Oregon Eilers, in turn, owned the stock of Spokane Eilers. In turn, the Eilers family and a few associates owned the stock of Eilers Music House and also three-fourths of the stock of Oregon Eilers. Hy. Eilers owned the greater majority of all such stock, and controlled and operated the whole outfit, practically as he determined. As pertains to the houses outside the city of Portland, while technically distinct corporations, with different officers and boards of directors, 'their instructions were re-ceived from and were given to them by Mr. Eilers, both in the way of financing and also their selling policy.' Broadly speaking, the operations were carried on by a direction that 'the branch houses would purchase the amount of merchandise that they needed from the parent house, and in turn would pay for the merchandise by discounting these customers' con-tracts or notes or leases, and the parent house would then give them credit for 72 per cent. of the face of the contract or 72 per cent. of the balance

of the contract; then we, in turn, would send that paper East, and would get our proceeds from that paper on the same basis. * * * Eilers Music House had a large warehouse on Fifteenth and Pettigrove streets; the pianos were received from the factory and placed there, and shipped to the branch houses, and then, if a piano was sold, it was naturally delivered to the customer, and then, if repossessed, advice on that repossession was sent to Portland, and the Portland house, having rediscounted the paper, would recall it. In the meantime the piano that was repossessed at one of the branch houses would probably have been resold, and another contract was executed on it, and it was probably assigned again.'

"The parent house did all the purchasing, and resold to the branches, in order to give it the greatest possible purchasing power; the branches were frequently called upon to issue their notes for the accommodation of the parent house, who negotiated them for greater credit. In the period of distress between 1916 and 1918, and even before, it became necessary for the whole organization to indulge in the practice of kiting checks; that is, the branches would issue their checks to the parent house, which would deposit them and take credit therefor, and in turn it would issue its checks to the branches, who likewise deposited those checks to their credit, and thus banking balances would in a way be maintained. With respect to the companies and business at Broadway and Alder, the three companies there situate participated in all such transactions, and the business was handled identically in the same way; but these additional features are to be observed with respect to them:

"The Music House owned the lease upon the premises occupied by them, and Oregon Eilers and the Talking Machine Company each paid rent direct to it; each corporation kept its own books, but the same clerks and help largely, if not entirely, took care of this work. Oregon Eilers took credit for all retail sales made on the Music House floor; it had access to the Music House and Talking Machine Company's stock in trade, the same as they had, and, if it desired those goods, it took them, as they, in turn, did with its stock, and a credit was passed from the one to the other, as the case might be. It turned its paper to the Music House, which in turn discounted it; their paper was handled by the same collateral clerk. The Music House and Oregon Eilers had a common cashier, also record, file, and stock clerks; there was a common shipping department and a common shipping receipt; for the greater portion of time a common letter head was used. All three issued accommodation paper to the other branches when needed. One large electric sign emblazoned the name of 'Eilers' before the world, and the warp and woof of all advertising was founded upon that one name. In short, for anything that appeared upon the surface, there was discernible there but one business, and, mere corporate entities aside, that is all there was in fact. There were many individual corporations, it is true; but they were simply mediums for the convenient and orderly dispatch of the multifarious Eilers businesses, parts and parcels of the same general enterprise, and nothing else whatever can be made out of it.

"Nor is the mind the less invited to the conclusion that the shadow rather than the substances of corporate entity obtained, and that the purpose, intent, and design was that all these corporations should be, and were, owned, operated, and controlled by and for one common interest, when the builder of the structure himself betrays his cognizance of its significance, on the eve of bankruptcy, by such language as this: 'January 23, 1918. Mr. A. E. Barnickel, Portland, Oregon—Dear Mr. Barnickel: There is one thing certain now—if we can't have Oregon Eilers and Spokane Eilers thoroughly separated from E. M. H. (Eilers Music House), some folks may make an attempt to have them all tarred with the same stick, and this should not happen. Very truly yours, Hy. E. [Hy. Eilers.]'

"The conclusion to be reached upon the situation thus created seems to me to be obvious. As Judge Sater says (In re Rieger [D. C.] 157 Fed. 614): 'The rule is clearly stated in Bank v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834, as follows: "In contemplation of law a corporation is a legal entity, an ideal per-

son, separate from the real persons who compose it. This fiction, however, is limited to the uses and purposes for which it was adopted—convenience in the transaction of business, and in suing and being sued in its corporate name, and the continuance of its rights and liabilities, unaffected by changes in its corporate members. But the fiction cannot be abused. A corporation cannot be formed for the purpose of accomplishing a fraud or other illegal act under the disguise of the fiction; and, when this is made to appear, the fiction will be disregarded by the courts, and the acts of the real parties dealt with as though no such corporation had been formed, on the ground that fraud vitiates everything into which it enters, including the most solemn acts of men  *  *  *  The good faith of the parties to such a transaction must be determined by its legal effect on the rights of others. If its legal effect works a fraud on their rights, the finding of a court that the parties acted in good faith is simply an erroneous conclusion of law from the facts." '

"Within the operation of this rule, however fair and above board the conduct of Eilers and his associates may have been in the manipulation of these corporations is of no importance. However well the state of their minds may have been disposed of at the time is of no advantage to them, if the effect of their conduct was injurious to the rights and destinies of the creditors, and if by their manner and form of doing business and the treatment of their corporations they indubitably lead their creditors to understand and believe the direct opposite of what they now maintain. The assets of an insolvent corporation do not, at least in this state, first of all, belong to the stockholders as represented by the capital stock. Those assets are a trust fund to be held for the payment of the debts of the corporation, and any disposition of them to deplete the estate is a legal fraud upon the creditors, whether so intended by the participants therein or not.

"And so it seems to me anachronistic to say that the officers and chief stockholders of the Music House, a failing and insolvent corporation, may lawfully determine to transfer to Oregon Eilers, of which they are likewise the officers and chief stockholders, a large amount of Music House property for something of no substantial value; may take from the former one of its principal branches of business and sources of income; may lead its creditors, by their contracts, representations, and engagements, to believe that whatever was done was done and performed in furtherance of the determination successfully to liquidate the debts and put upon a sound foundation the Eilers businesses; may in fact for almost two years combine, handle, and operate the several corporations for that purpose and with that design; yet are at liberty, when the immersion in failure actually comes, to segregate from the mass that portion which seems to have value, upon the ground solely that it is a distinct corporate entity in which they hold the stock. The persons involved are estopped to do this by every consideration which a court of equity may draw upon. In such cases equity looks through and beyond legal fictions, and deals with the parties and the properties irrespective of corporate forms, upon the theory that now to contemplate Oregon Eilers as an independent organization, which its promoters may take to themselves from the general assets, is a legal fraud upon the creditors. This principle has been many times applied and is abundantly established by the following cases: In re Holbrook Shoe & Leather Co. (D. C.) 165 Fed. 973; In re Cleve Clothing Co. v. Union Trust Co., 224 Fed. 366, 140 C. C. A. 49; In re Rieger (D. C.) 157 Fed. 613; In re Looschen Piano Co. (D. C.) 261 Fed. 93, 44 Am. Bankr. Rep. 190; Hunter v. Baker Motor Vehicle Co. (D. C.) 225 Fed. 1006.

"The challenge to the jurisdiction of this court to dispose of the controversy in a summary proceeding is overcome by the conclusion that these assets are a part of the general estate of the Music House, and merely held by Oregon Eilers as an agent or branch thereof. The jurisdiction of this court is not ousted by the circumstance that an adverse claim has been set up. Before there is an ouster the claim must have such foundation in law and in fact as to make it appear to the court highly probable that it exists, can be maintained, and is asserted in good faith. Remington on

Bankruptcy, § 1654½ et seq.; Schweer v. Brown, 130 Fed. 328, 64 C. C. A. 574; In re Holbrook Shoe & Leather Co., supra. As to how the assets of Oregon Eilers should be disposed of I make no recommendation, further than to say it appears to be the rule in such cases that those assets are first applied in satisfaction of the claims of its individual creditors. This question, of course, is not embraced in the order of reference.

"For the reasons assigned, I recommend that an order be entered herein, directing the officers and directors of Oregon Eilers Music House to surrender the assets now in their possession to the trustee of Eilers Music House for administration according to law."

The District Court reviewed the exceptions and the testimony which had been heard before the referee, and affirmed the report of the special master, except as to a finding that as a matter of fact, when the stock of Graves & Co. was purchased, it was understood it should be done for the use and benefit of the individual stockholders of the Piano House. The court regarded this as a conclusion not warranted by the testimony. Thereafter decree was ordered confirming the report of the master, and ordering the trustee to take immediate possession of Oregon Eilers Music House and all of its assets and property as part of the bankrupt estate.

Ralph R. Duniway, of Portland, Or., for petitioner and appellant.
W. C. Bristol, of Portland, Or., for respondent and appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

PER CURIAM. [1] As the controversy involves facts as well as legal questions, petitioner is confined to a remedy by appeal under section 24a of the Bankruptcy Act (Comp. St. § 9608), and as a consequence the motion of the respondent to dismiss the petition for revision is well taken and must be sustained. In re Loving, 224 U. S. 183, 32 Sup. Ct. 446, 56 L. Ed. 725; In re Craig Lumber Co. (C. C. A.) 266 Fed. 692.

[2, 3] We have carefully considered the whole case upon the issues of fact and law, and have regarded it as properly before us by appeal, and as the opinions of the District Court and the referee, and the findings made by the referee, fully cover the substantial issues of the controversy, we do not think it necessary to restate the evidence or to enter upon further discussions of the legal principles applicable thereto. We are satisfied that the case was rightly decided and that the court properly entertained jurisdiction. Babbitt v. Dutcher, 216 U. S. 113, 30 Sup. Ct. 372, 54 L. Ed. 402, 17 Ann. Cas. 969; Clerc v. Union Trust Co., 224 Fed. 366, 140 C. C. A. 49; Hunter v. Baker Motor Vehicle Co. (D. C.) 225 Fed. 1015; Linn & Lane Timber Co. v. United States, 196 Fed. 593, 116 C. C. A. 267.

Respondents' motion to dismiss the appeal is denied. The decree is affirmed.

ROSS, Circuit Judge (dissenting). These cases have been argued and submitted together; one being a petition for the revision of proceedings in bankruptcy, and the other an appeal from the decrees of the court—the complaining party, a corporation styled Oregon Eilers Music House, being uncertain regarding its true remedy. In such circumstances, that it was justified in resorting to both appeal and petition to bring up for review the rulings of which it complains is well

settled. Chavelle v. Washington Trust Co., 226 Fed. 400, 141 C. C. A. 230, and cases there cited.

The record shows that the bankrupt, a corporation called Eilers Music House, was adjudged bankrupt by the court below in the year 1918. April 30, 1919, the trustee filed and presented to the court a very voluminous petition, verified upon his "belief," by which he asked the court for an order requiring the corporation known as the Oregon Eilers Music House to turn over to him as such trustee a large amount of property that the petitioner alleged belonged to the bankrupt.

Among other things, the petition alleged that in February, 1908, a corporation known as the Eilers Piano House acquired by purchase the property and business of a corporation doing business under the name of Graves & Co., taking the capital stock thereof in the names of the officers and directors of the Eilers Piano House, but in trust for that corporation, such stock having been paid for by its funds; that in April, 1910, the bankrupt corporation was organized, and that a few days thereafter the Eilers Piano House conveyed to it all of the property in question, in consideration of which the Eilers Music House assumed and agreed to pay all the debts and liabilities of the Eilers Piano House, but that in pursuance of a scheme of the officers of those two corporations, and for the purpose of preventing the property of Graves & Co. from passing to the Eilers Music House, they caused Graves & Co. to be reorganized into another corporation known as the Oregon Eilers Music House, under which name the latter proceeded to do business, but that in fact it was the agent and representative of the bankrupt corporation and held all of the said property therefor.

An order to show cause having been made and served upon the Oregon Eilers Music House corporation why the order petitioned for should not be made, that corporation appeared and filed an answer to the petition, duly verified, in which it first objected to any jurisdiction in the court over it by virtue of any matters set forth in the petition, alleging, among other things, that it was a corporation organized and existing under the laws of Oregon, separate and distinct from the Eilers Music House corporation, and alleging that the Oregon Eilers Music House corporation is the Graves Music Company, Incorporated, and was organized and in existence years prior to the organization of the bankrupt corporation, and that the latter is a minority stockholder in the Oregon Eilers Music House corporation, and a debtor thereto. and further that the Oregon Eilers Music House corporation has no property or assets belonging to the bankrupt, and asking that the petition be dismissed.

The answer also put in issue many of the allegations contained in the petition, denying, among other things, the allegation that the Oregon Eilers Music House corporation is a constituent or subsidiary part of the business of the bankrupt corporation, or an agency thereof. The answer admitted that the petitioner, as trustee of the bankrupt corporation, has and holds 457 shares, of the par value of $45,700, of the capital stock of the Oregon Eilers Music House corporation, and as affirmative matter the answer alleged that long prior to Febru-

ary, 1908, there was a corporation of Oregon incorporated and existing under the name of Graves & Co., Incorporated, and that on the 8th of that month and year the stock of that company was bought by the Eilers Piano House corporation, organized in December, 1901, under the laws of the same state, which stock was so bought for the purpose of selling it to certain individuals, which was done, they paying therefor, and that thereafter the Eilers Piano House corporation had no interest in the stock of Graves & Co., Incorporated; that the Eilers Music House corporation was not incorporated until 1910, and never had any interest in Graves & Co., Incorporated, which corporate name was thereafter changed to Graves Music Company, until in 1916 the Eilers Music House corporation, then a solvent and going concern, sold its Portland retail business, good will, and certain personal property to the Graves Music Company for $45,000 of the stock of that company and caused the Graves Music Company to change its name to Oregon Eilers Music House, and caused the latter to move part of its business to the building at Broadway and Alder streets leased by the Eilers Music House, taking a sublease from the latter of a part of the building, which transaction was all consummated in good faith and for value in 1916, long before the bankruptcy of the Eilers Music House corporation; that the only interest the latter has in the Oregon Eilers Music House corporation is that of a minority stockholder owning $45,700 of its capital stock, and that it is a debtor to the Oregon Eilers Music House corporation to the extent of $31,764.59 for merchandise and cash delivered by the latter to the Eilers Music House corporation at its special instance and request prior to its being adjudged a bankrupt; that the two last-mentioned corporations had mutual dealings as separate and distinct corporations, and that on March 12, 1919, the Oregon Eilers Music House corporation duly presented and proved its claim in the bankruptcy proceedings against the Eilers Music House corporation for $31,764.59, and also has pending certain other claims against the bankrupt for certain property; that when the receiver of the bankrupt was appointed he was given full information regarding the organization and business of the Oregon Eilers Music House corporation and given access to its books and records. The prayer of the answer was that the petition be denied and dismissed, with costs against the petitioner.

The view taken by the court below is best shown by this excerpt from its opinion filed June 21, 1919:

"The only question, I take it, in the case, is whether the court has jurisdiction, based upon the allegations of the petition, if true, to make an order summarily requiring the defendant corporation to turn over property in its possession to the bankrupt concern or its trustee, and that depends entirely upon the question as to whether the property in fact belonged to the bankrupt at the time the petition in bankruptcy was filed. The bankruptcy court has jurisdiction in a summary proceeding to require a bankrupt or any agent or representative of the bankrupt in possession of its property, to turn it over to the trustee; but it has no jurisdiction in such a proceeding to determine a bona fide dispute as to the title to property not in the possession of the bankrupt at the time the petition is filed, and which is claimed by an adverse party.

"This case presents that issue as a question of fact, and I do not know any way it can be determined until there is some evidence in reference to the matter. If the allegations of the petition are true, then this property would seem to belong to the bankrupt and should be turned over to it. If the denials in the answer are true, and the affirmative matter set up correctly portrays the facts, then the court has no jurisdiction, but the remedy of the trustee is a plenary suit or in some other proceedings.

"So I take it this motion should be overruled, and the matter come to hearing upon the averments of the petition and the denial and affirmative matter set up in the answer. In view of the necessity of a prompt disposition of this matter, as should be the case in all bankruptcy proceedings, an order will be made referring it to the referee in bankruptcy as a special master, to examine into the question and report."

Upon the reference to the special master a large amount of evidence, oral and documentary, was introduced, resulting in voluminous findings by him, with the recommendation that an order be entered "directing the officers and directors of Oregon Eilers Music House to surrender the assets now in their possession to the trustee of Eilers Music House for administration according to law," to which numerous exceptions were taken, considered by the court below, and overruled, and the recommendations of the master embodied in the decree of the court.

I think the court was in error in undertaking to determine the issues between the contesting parties as one of the incidents of the bankruptcy proceedings before it, and am clearly of the opinion that the Oregon Eilers Music House corporation was entitled to have those issues tried and determined in an independent suit. The case of Looschen Land & Building Co. et al. v. Milson, In re Looschen Piano Case Co., decided by the Circuit Court of Appeals for the Third Circuit July 3, 1920, is, I think, directly in point. 266 Fed. 359.

In the case of Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, it was not denied that the property in question belonged to the bankrupt, but the proposition was (see pages 13, 14, 15) that as matter of law, the property having come into the hands of a third party as agent of the bankrupt before the filing of the petition in bankruptcy, the bankruptcy court had no power by summary proceedings to compel its surrender to the trustee, even though the agent asserted no adverse claim to it. The court held against the contention, and sustained the power of the bankruptcy court to take the property by summary process. It is manifest that that case is entirely different from the present one.

As in effect said in the excerpt from the opinion of the court below above quoted, undoubtedly, if the facts set up in the answer of the Oregon Eilers Music House corporation be true, the property in dispute could not be summarily taken from it and turned over to the estate of the bankrupt. And it being equally clear that no court could be justified in assuming that the facts so alleged and sworn to were not true, the necessary conclusion is, I think, that the party in possession of the property in good faith claiming to own it, as was the case here, was and is entitled to hold it until its alleged right thereto should be adversely determined in a plenary suit. Otherwise, in every such case, where the representative of the bankrupt claims the property,

the bankruptcy court has exclusive jurisdiction to decide the question of ownership in a summary way.

These views find some support in the following observations of the learned judge of the court below, in confirming the master's report and decreeing the delivery of the property to the trustee of the bankrupt:

"Upon the issues thus joined the case was referred to the special master who, after exhaustive and elaborate hearings, filed a report in which he detailed the facts as he understands them and reaches the conclusion that the assets of the Oregon Eilers were in truth and in fact a part of the assets of the bankrupt's estate, and recommends that an order be entered requiring that they be turned over to the trustee. I have read this testimony time and again; I have examined it in the light of the arguments and briefs, and I am forced to concur in the views of the special master, although I do not agree with some of his findings of fact. He finds that as a matter of fact at the time the stock of Graves & Co. was purchased it was understood it should be done for the use and benefit of the individual stockholders of the Piano House, but I am of the opinion that this was a conclusion not warranted by the testimony. The records of the corporation and the entire transaction are against any such conclusion. The contract entered into for the sale of the stock was made in the name of the Piano House and for its benefit. It was done in pursuance of resolution of the Piano House and was paid for by the Piano House.

"It is true that charges were made on the books against the account of individual stockholders for a part, if not all, the moneys used in paying the notes of the Piano House, but I am not able to determine whether that was merely a bookkeeping transaction or for some other purpose. The status of the accounts of these respective stockholders does not appear very clear from the testimony. It is in evidence, I believe, that at the time those charges were made there stood upon the books to the account of these gentlemen individually a credit sufficient to cover these charges, but whether there were any other obligations is not so clearly disclosed. In January, 1914, an audit of the books seems to have been made, at which time it was reported that there were stockholders' bills receivable outstanding amounting to $202,000. Whether any of this was outstanding at the time this transfer was made is not apparent. At the time of the bankruptcy, an expert examination of the books disclosed that there was about $400,000 due the corporation from these several stockholders, but I do not take this to be very material.

"The stock was purchased and paid for by the Piano House, it became the property of the Piano House, and the Piano House, as far as the record discloses, never has parted with that stock, and when it transferred its business and assets to the bankrupt, it naturally transferred this stock and the interest therein, together with the other assets. So that on the whole I am of the opinion that the report of the special master must be confirmed, and an order of that kind will be entered."

Surely, it seems to me, the party in possession of the property, in good faith claiming to own it, was entitled to have the omissions, doubts, and uncertainties that the court below thus found to exist in the summary proceedings, tried and determined in a plenary suit between the contesting parties.

In my opinion the appeal should be dismissed, with costs thereof against the appellant, and the decrees of the court below of June 21, 1919, and July 20, 1920, should be reversed, with costs to the petitioner, and the cause remanded to the court below for further action in accordance with the views above expressed.