[Civil No. 3900.   Filed July 8, 1938.]

[81 Pac. (2d) 90.]

RALPH H. WALKER, Appellant, v. SOUTHWEST MINES DEVELOPMENT COMPANY, a Corporation; ARIZONA CONSOLIDATED MINING COMPANY, a Corporation; GENERAL SECURITIES COMPANY, a Corporation; W. A. NICKERSON, E. F. YOUNG, F. A. REID, CLAUD B. ANDREWS, FRED FORD, L. B. LeBEL; THE ROYAL AMERICAN CORPORATION, a Corporation; R. O. BARRETT, L. K. LINK, E. C. LOCKLEAR and MARK BRADLEY, Receiver, Appellees.

Mr. F. C. Struckmeyer, Mr. J. Bolivar Sumter, Mr. James E. Flynn, and Mr. F. C. Struckmeyer, Jr., for appellant.

Messrs. O'Sullivan & Morgan, for appellees.

McALISTER, C. J.—This is an appeal from judgments rendered in two cases consolidated for trial in the superior court. The first was a minority stockholders' suit brought by Ralph H. Walker on behalf of the Southwest Mines Development Company, a corporation, himself and all other stockholders therein similarly situated, its purpose being to have the court set aside certain conveyances executed by that company to the Arizona Consolidated Mining Company and to restore the property thus conveyed to the Southwest Company. The second was an action by the assignee of the mortgagee to foreclose certain real and chattel mortgages executed by the Arizona Consolidated Mining Company on the property conveyed to it by the Southwest Mines Development Company, in which Walker, the plaintiff in the first action, intervened. The judgment in each case was against him and he has appealed from both.

The record is voluminous but the following statement discloses the facts necessary to a proper disposition of the appeal. The Southwest Mines Development Company, hereafter referred to as the Southwest, was organized in 1923 by W. A. Nickerson and E. F. Young with a capitalization of 750,000 shares of the par value of one dollar each, and according to its articles of incorporation the general nature of the business to be transacted by it was to acquire, exchange, sell or otherwise dispose of, mortgage and deal in mines, mining claims, mineral lands, coal lands, oil lands, water and water rights and other property, both personal and real, and to operate and develop the same; to purchase or otherwise acquire, erect, operate and sell milling, smelting and other ore reduction

works, railways and tramways to lead from the company's principal works;

"to own, purchase, or otherwise acquire and to sell, hypothecate and otherwise deal in shares and securities issued by itself or other corporations, persons or co-partnerships, and to cancel and re-issue its own shares and to vote shares of other corporations; . . . and in general to do and perform such acts and things and transact such business, not inconsistent with the law, in any part of the world, as the Board of Directors may deem to the advantage of the corporation."

In 1929 these articles were amended in such a way as to provide for a capitalization of 2,000,000 shares of the par value of one dollar each. From the date of its organization W. A. Nickerson had been the president of its board of directors and from 1929 E. F. Young, his sister-in-law, its secretary, and these two officers owned more than two-thirds of its outstanding stock of 1,000,000 shares, the remainder belonging to about one hundred stockholders in and out of the state, the plaintiff and intervener, Ralph H. Walker, of Phoenix, Arizona, being the owner of 12,000 shares. The five persons named by the original articles of incorporation as the board of directors never changed, though following their amendment neither Walker nor the other two, H. V. Young and Albert Oechsler, ever attended its meetings which were of an informal character, or took any part in its deliberations. Nickerson and Young, the secretary, conducted its affairs, the company being in reality the *alter ego* of the former.

Among its articles of incorporation was this:

"Article X

"This corporation shall have power, at any time, to sell, transfer and dispose of its assets, upon the written consent of the owners of two-thirds of the capital stock then outstanding."

In 1929 the Southwest became the owner of the mining property involved in this action, which is situated in Yavapai county, Arizona, and consists of four patented and thirty unpatented mining claims and four mill sites, together with the machinery, buildings and equipment of every kind located thereon. The value of this property does not appear, but according to the complaint it amounted to several hundred thousand dollars, though in 1932 the Southwest was unable to meet its obligations, Nickerson having written the stockholders that year that the company was about to lose its property, and the minutes of the board of directors under date of June 6, 1932, disclose that the

"president stated that this company was confronted with serious financial conditions and that some plan of reorganization or the incorporation of a new company must be worked out."

Three months later, or on September 14th, Nickerson and Young, its president and secretary respectively, incorporated the Arizona Consolidated Mining Company, referred to hereafter as the Arizona Company, with a capital structure similar in all respects to that of the Southwest, a certificate for 10,000 shares being issued to Nickerson at that time. No further action, however, was taken by it that year, but the financial difficulties of the Southwest did not end with the close of 1932; they continued into the next year. The Arizona Power Company secured a judgment against it for $2,073.23 in September, 1933, and was about to sell its property thereunder, and $4,700 in wages were due one Albert Oechsler for nearly four years' work. Faced with this situation, it conveyed to the Arizona Company by a deed dated August 1, 1933, and executed by Young, the secretary, on August 30th and by Nickerson, its president, on December 11, 1933, all its real, and by appropriate instruments, all its per-

sonal property, and accepted in exchange therefor approximately one million shares of the Arizona Company's stock, to-wit, 990,000 shares. No one of its stockholders or directors had any knowledge of the transfer or took any part in the negotiations leading to it, other than Nickerson and Young who were also president and secretary, respectively, of the Arizona Company, and who, with Albert Oechsler, an employee of the Southwest, formed its board of directors, and as such took possession of the property conveyed to it by the Southwest.

Before the instruments of conveyance were executed, however, and late in November, 1933, Nickerson went to Los Angeles and sought a loan of $15,000 from the defendants, General Securities Company and the Royal American Corporation, both of that city, and as an inducement to them to advance it informed them that the Arizona Company owned all the property conveyed to it by the Southwest and that this amount would enable him to put the mine in production and constitute a safe loan. As a result of these representations the defendant, Fred Ford, president of the General Securities Company, came to Arizona to look over the property and on December 15, 1933, after he had investigated it, that corporation loaned the Arizona Company $15,000 and took its note for that sum secured by a first mortgage on the property transferred to it by the Southwest.

Four days later, or on December 19, 1933, the Royal American Corporation, the owner of most of the stock of the General Securities Company, purchased a five per cent. interest in and to all the minerals in the mining claims conveyed to the Arizona Company by the Southwest for $1,500 which, together with the proceeds of the $15,000 loan, were used by the Arizona Company in satisfying the Arizona Power Company's judgment

and in purchasing an engine and other equipment for the use of the property. The Arizona Company operated the property from then until April 20, 1934, through Nickerson, during which period it borrowed through him from the Royal American Corporation an additional $1,250, which was also used for the benefit of the property, but after that date it carried on operations for some months under a board of five members composed of F. A. Reid, Claud B. Andrews, Fred Ford, L. B. LeBel and W. A. Nickerson. These men superseded the old board made up of Nickerson, Young and Oechsler, on April 20, 1934, the change in membership having come about as a result of an agreement entered into that day between Reid and the Southwest, which, so far as pertinent here, provided as follows: First, the Southwest agreed to sell and Reid to buy 940,000 shares of the Arizona Company's stock then owned by the Southwest for thirty cents a share, or $282,000, the last payment to be made at the end of three years, and that the profits to be derived from the sale of this stock by Reid should be divided among four persons, the Southwest and the Royal American Corporation each to receive twenty per cent.; second, it required the Southwest, the owner of practically all the outstanding stock of the Arizona Company, to bring about the resignation of the directors of the latter corporation, except Nickerson, and cause the four persons just mentioned to be elected to that position, and these three, Reid, Nickerson and Andrews, to be chosen president, vice-president and secretary-treasurer, respectively; third, it obligated Reid, in case it was, in the opinion of the board of directors of the Arizona Company, necessary to have additional funds for increased operations, to loan or cause to be loaned to that corporation a sum not in excess of $10,000.

After the new directors and officers took over the management on April 20, 1934, they borrowed from the Royal American Corporation on its unsecured notes $20,000 and, not being paid when due, these notes were assigned to the defendant, R. O. Barrett, who brought suit on them, secured judgment for $23,880.06 with interest, purchased the property when sold by the sheriff and assigned his certificate of sale to the defendant, L. H. Link, to whom the sheriff's deed was later issued, thus making him the legal owner of the property subject only to the mortgage of the General Securities Corporation.

Late in 1934 the Southwest, through Nickerson, its president, and other officers, brought an action to cancel the stock purchasing agreement with Reid, whereupon work on the property was discontinued. That case was not tried but a consent judgment canceling the agreement was later entered.

No meeting of either the directors or stockholders of the Southwest was, according to the complaint, called or held subsequent to December 11, 1933, for the purpose of ratifying the transfers by Nickerson and Young. The plaintiff, Ralph H. Walker, the complaint alleges, learned about the transaction in August, 1934, and soon thereafter Nickerson sought the advice of the attorney general as to whether the Southwest might be able to set the transaction aside and that office informed him that it might be able to do so but that "it would be more desirable to have a minority stockholder and an apparent protestant to the transaction to institute the suit." Following this the plaintiff, a close long time friend of Nickerson's, demanded of the proper officers of the Southwest that they bring an appropriate action to set the conveyance aside and restore to it the property conveyed and, failing

to procure such action, filed the minority stockholders' suit himself in December, 1934.

On May 7, 1935, the General Securities Corporation assigned the note and mortgage given it by the Arizona Company to the defendant, E. C. Locklear, who, on May 24th thereafter, instituted foreclosure proceedings thereon, and the plaintiff, Walker, became a party to that action through intervention, his claim for relief being based almost wholly upon the same facts he had pleaded in his minority stockholders' suit.

At the end of a four-day trial the court made full and complete findings, among which were practically all the foregoing facts, together with these additional ones: that in transferring the assets of the Southwest to the Arizona Company in exchange for the latter's stock, Nickerson and Young were actuated solely by a desire to protect the interests of the Southwest and its stockholders and were guilty of no fraud whatever; that in loaning the Arizona Company $15,000 and taking mortgages on its assets as security, the General Securities Corporation acted in good faith and without any notice or knowledge as to any defect in title, and that the Royal American Corporation, in purchasing a five per cent. interest in the minerals of the claims here involved, and in loaning the Arizona Company $20,000 on its unsecured notes acted entirely in good faith and without any intent to defraud.

Basing its conclusion upon its findings, the court decided the minority stockholders' suit in favor of the defendants and the foreclosure action in which Walker intervened in favor of the plaintiff, Locklear. Walker has appealed from the judgment in both cases, but the facts in each, in so far as they affect him, are without substantial difference, so any rights he may have had as plaintiff in the suit filed by him or as

an intervener in the foreclosure proceeding grow out of practically the same facts.

Appellant has made twenty-seven assignments but discusses them under two propositions of law, though in disposing of the appeal it will not be necessary to consider these in detail. The complaint is based upon the fundamental proposition that the transaction by which the Southwest conveyed through W. A. Nickerson, its president, and E. F. Young, its secretary, on December 11, 1933, all its property to the Arizona Company in exchange for 990,000 of the latter's 2,000,-000 shares of stock, none of which had been issued up to that time, except the 10,000 shares to Nickerson upon the incorporation of the company, was void and wholly ineffective. The conveyance was made upon the theory that Article X of the Southwest's charter authorized it, but appellant contends that notwithstanding the fact that the language of that article does vest the owners of two-thirds of its outstanding stock with the power to sell its entire assets, it does not follow from this that that provision empowers the Southwest, first, to exchange its assets for stock in another corporation, or, second, either to sell or exchange them without first submitting the question to the stockholders at a meeting regularly called and held for that purpose.

The good faith of Nickerson and Young, the president and secretary, respectively, of the Southwest's board of directors, in transferring the assets of that corporation to the Arizona Company in exchange for stock of the latter is not questioned by appellant, nor does he claim that Nickerson and Young, who held the same position with the Arizona Company, were actuated by other than good motives in thereafter executing mortgages on the assets of that company to secure the repayment of the $15,000 it borrowed from

the General Securities Corporation, or in disposing of a five per cent. interest in the minerals of the claims herein involved to the Royal American Corporation for $1,500, or in obligating itself to repay that corporation the $1,250 advanced to it. But he does contend that the transfer of the property was wholly void and that both the General Securites Corporation and the Royal American Corporation had notice and complete knowledge of the illegality of the conveyance to the Arizona Company when they made these loans to it and that they did this with the intent to defraud the Southwest and its stockholders.

Appellant's contention that the sale of the Southwest's assets to the Arizona Company is void is based upon two propositions: First, that the Southwest could not take stock in another corporation in exchange for its assets, and, second, that it did not submit the question of disposing of its assets to its stockholders at a meeting regularly called and held for that purpose. He cites a number of authorities in support of these propositions but appellees contend that inasmuch as the charter of none of the corporations involved in the cases cited by him contains a provision similar to Article X they have no application here. Whether, however, appellant's contention is, upon either of the grounds mentioned, sound, is under the facts and the view we take of them, immaterial. The property in question was acquired from Nickerson by the Southwest in 1929 and it is plain that from then until December 11, 1933, when it was conveyed to the Arizona Company, Nickerson managed its holdings and conducted its business as though both were his, and there was no change in his control of it following the transfer until April 20, 1934, when the Arizona Company elected a new board of directors. The secretary herself, his sister-in-law, testified that the corporation was his, or so she considered it, and that she left the

management of it to him, while the testimony of Albert Oechsler, another director, was that he had never attended a directors' meeting or paid any attention to the operation of the company but left the whole management to Nickerson whose every act was satisfactory to him. The facts disclose that the financial troubles which the Southwest began to have in 1932 had grown so serious by June of that year that he wrote the stockholders about it and told its board of directors on June 6th that "some plan of reorganization or the incorporation of a new company must be worked out." He was directed by the board at that time to investigate the best plan of accomplishing this and report his findings at a meeting to be held on August 29th, and the minutes of that date, though unsigned, state that he recommended that a new corporation, similar in all respects to the Southwest to be called the Arizona Consolidated Mining Company, be organized and that the property be transferred to it in exchange for one million shares of its capital stock, because in that way the Southwest would still retain control. Two weeks later, or on September 14th, this recommendation was followed, that being the date the Arizona Company was incorporated by Nickerson and Young.

██ The Southwest did not, however, convey its assets to the new company at that time but by the latter part of 1933 its financial difficulties had reached such a point that it was necessary for it to procure funds to take care of its obligations or lose its property. So, Nickerson, evidently thinking that it would have a better chance of obtaining the money if it conveyed its property to the new company and borrowed through it, caused the Southwest to transfer its assets to that company on December 11, 1933, and take in exchange all the latter's outstanding stock, 990,000

shares. By following this course, the Southwest still retained control of the property through its ownership of the stock, and Nickerson, the president of both boards of directors and owner of more than two-thirds of the Southwest's outstanding stock, continued completely to dominate both corporations. Plainly his purpose in organizing the new company was to create an instrumentality, agency or conduit through which he could manage or carry on the business of the old one, especially that particular phase of it which was then so pressing, namely, the borrowing of funds with which to take care of its unpaid obligations. And, this being true, it follows that the agreement Nickerson caused them to make by which the assets of the old and the stock of the new corporation were exchanged for each other was nothing more than a contract the Southwest made with itself, because it was in reality both parties to the transaction. And while it is true that the new company was in form a distinct, legal entity and that when the facts show this to be true in substance as well as in form the fiction of corporate entity should be respected, yet when it is clear that the new corporation is simply the old one clothed in a new dress and that it constitutes merely an instrumentality or conduit through which the latter intends to and does act, the legal fiction should be disregarded. The following language in *Platt* v. *Bradner Co.,* 131 Wash. 573, 230 Pac. 633, expresses the view we think peculiarly applicable to a situation of this kind (p. 635):

"It is also well-settled law that, while in general, a corporation is a separate legal entity, nevertheless when one corporation so dominates and controls another as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct corporate existence, as the interests of justice require; and where stock ownership is re-

sorted to not for the purpose of participating in the affairs of the corporation in the customary and usual manner, but for the purpose of controlling the subsidiary company so that it may be used as a mere agency or instrumentality of the owning company, the court will not permit itself to be blinded by mere corporate form, but will, in a proper case, disregard corporate entity, and treat the two corporations as one. 1 Fletcher, Cyc. of Corporations, p. 63, § 45; Id., 1921 Supplement, vol. 10, p. 11, § 45; *Spokane Merchants' Assn.* v. *Clere Clothing Co.*, 84 Wash. 616, 147 Pac. 414; *Clere Clothing Co.* v. *Union Trust & Savings Bank*, 224 Fed. 363, 140 C. C. A. 49; *Advance-Rumley Thresher Co.* v. *Geyer*, 40 N. D. 18, 168 N. W. 731. See, also, *In re Eilers Music House*, (C. C. A.) 270 Fed. 915; Id., (C. C. A.) 274 Fed. 330; *Luckenbach S. S. Co.* v. *W. R. Grace & Co., Inc.*, (C. C. A.) 267 Fed. 676; *Hunter* v. *Baker Motor Vehicle Co.*, (D. C.) 225 Fed. 1006.''

Therefore, in dealing with Nickerson as the president and manager of the Arizona Company, appellees, General Securities Corporation and the Royal American Corporation, were to all intents and purposes doing business with the Southwest and, this being true, equity demands that the agreements by which they loaned the Arizona Company more than $35,000 and took as security for $15,000 thereof a mortgage on the property conveyed to it by the Southwest, the other $20,000 thereof having been advanced upon its unsecured notes, be treated as though they had been made with the Southwest and enforced accordingly. To permit the fiction that the Arizona Company was in fact a separate legal entity when it borrowed these funds to prevail would result in the grossest injustice, for it would defeat the claims of appellees which, the court found, loaned their money in good faith and without any intent to defraud, a conclusion amply supported by the evidence.

What we have said renders the consideration of the other contentions of appellant unnecessary. It is wholly immaterial whether appellees had notice of the defect in the Arizona Company's title to the property in question, for they in fact, if not in name, dealt with the Southwest, whose right to borrow the funds under the circumstances is without question.

It follows that the judgment in favor of the defendants in the minority stockholders' suit, No. 13261, and the judgment in favor of the plaintiff in the foreclosure action, No. 13369, are correct, and they are both hereby affirmed.

ROSS and LOCKWOOD, JJ., concur.