In re DESNOYERS SHOE CO.

DOZIER v. SANGAMON LOAN & TRUST CO. et al.

(Circuit Court of Appeals, Seventh Circuit. May 20, 1915.)

No. 2106.

1. CORPORATIONS ⬅══88—STOCK SUBSCRIPTIONS—RESCISSION—RECOVERY OF PAYMENT.

An Illinois corporation in January received $50,000 from D. under a contract which provided that it was to become a part of the capital stock as soon after July 1st as an increase in the capital stock could be arranged; that it was to become special capital until it could be merged into the general capital stock; that it was to bear the same percentage

of dividends as regular stock from January 1st, and in addition interest until July 1st; that, if D. or his son desired to become officers and directors, such arrangement would be made; and that the president would give the son every legitimate opportunity of learning the business. The son was employed by the corporation. The corporation gave out a financial statement stating that D.'s investment was special capital until July 1st, when it was intended to increase the capital stock. Interest was paid to September 1st, but no dividends were paid, and in August the corporation was adjudicated a bankrupt. *Held*, that while the president and directors of an Illinois corporation have no authority to sell a prospective, but unauthorized, increased issue of stock, and therefore payment in advance under such a contract could be recovered, D. could not recover his payment on this theory, since the payment was not merely an advance payment on account of stock, and even if treated as a loan, until the increase of the stock, the implied obligation of the corporation to repay the loan was an enforceable counter promise for the payment, and barred a rescission, notwithstanding the lack of enforceability of the promise to issue the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 337–364, 425–428; Dec. Dig. ☞88.]

2. CORPORATIONS ☞88—STOCK SUBSCRIPTIONS—RESCISSION—RECOVERY OF PAYMENT.

D. could not rescind as for a failure of consideration, as the engagement of his son and the promise to pay, in addition to interest, a sum equal to dividends, were partial considerations for the payment, though the son derived little, if any, benefit through his employment, and the company's condition made it extremely improbable that dividends could be declared, and hence there was at most only a partial failure of consideration, which gives no right of rescission.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 337–364, 425–428; Dec. Dig. ☞88.]

3. CORPORATIONS ☞566—INVESTMENT OF "SPECIAL CAPITAL"—RIGHTS AS AGAINST CREDITORS—"CAPITAL."

Even if D. was entitled to priority in the distribution of the funds of the corporation as against stockholders, he did not have the standing of a creditor as against other creditors, since the "capital" of a stock company or of a business is the fund intended to be subject to the risks of the business, and contributed to meet the obligations of the business, and to be repaid to the contributors only after all other obligations have been satisfied, and, while the phrase "special capital" in reference to a corporation has no established legal meaning, the parties evidently intended that the investment should be subject to the risks of the business, and share in the profits in exactly the same way as the actual capital.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2283–2286; Dec. Dig. ☞566.

For other definitions, see Words and Phrases, First and Second Series, Capital.]

4. ESTOPPEL ☞83—REPRESENTATIONS AS TO FINANCIAL STANDING—INVESTMENTS—STOCKHOLDER OR CREDITOR.

In an event, D. was estopped as against those creditors relying on the financial statement, as, even though it was not expressly authorized by him, it stated the facts in exact accordance with the agreement, and was therefore impliedly authorized by him.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 218, 227–229; Dec. Dig. ☞83.]

Appeal from the District Court of the United States for Southern Division of the Southern District of Illinois; Arthur L. Sanborn, Judge.

In the matter of the Desnoyers Shoe Company, bankrupt. An order of the referee allowing the claim of Lewis D. Dozier over the objections of the Sangamon Loan & Trust Company, trustee in bankruptcy, and another, was reversed by the District Judge (210 Fed. 533), and the claimant appeals. Affirmed.

Appellant, Dozier, a wealthy business man, after some conversations with W. L. Desnoyers, president of the bankrupt Desnoyers Shoe Company, as to the advisability of his investing money in the Desnoyers business and of having them provide a place for his 21 year old son, expressed his willingness to put in $50,000 and asked Desnoyers to draw up a paper covering the arrangement reached. Thereupon, Desnoyers dictated the following document, dated January 24, 1911, on the letterhead of the company:

"Mr. L. D. Dozier, Sr., St. Louis, Mo.—Dear Sir: In accepting your check for $50,000, receipt of which is hereby acknowledged, we wish to cover all the points of the agreement between us, of which your payment is the initial step. The $50,000 received from you, and referred to above, is to become a part of the capital stock of the Desnoyers Shoe Company as soon after July 1st as we can legally arrange for an increase to our capital stock, the increase to be from the present $300,000 to $500,000 and to be all paid in in cash or its equivalent, except $50,000, which is to be carried for the account of the undersigned until such time as the dividends on same shall have paid for the principal or until it shall be paid for in cash, or, in the event of my death, it shall become treasury stock for the company, with exception of such parts as have already been paid for in the manner outlined above. The $50,000 which you are now paying, it is understood, is to become special capital until such time as we are able to merge it into the general capital stock in the manner outlined above, and it is to bear the same percentage of dividends as regular stock beginning from the 1st of January; and, in addition to this, as a premium for prepayment, we will pay you 6 per cent. per annum for interest on the said amount from to-day until the 1st of July. It is further understood to become a part of this agreement that if you, or Lewis, or both, should desire to become officers and directors, or both, of this company, that such arrangements will be made. It is further understood that the writer is to give Mr. Lewis D. Dozier, Jr., every legitimate opportunity to increase in knowledge in the shoe business or such general business as comes before the writer. It is further understood that the salary basis under which I am now working will be changed after July 1st, and that, in lieu of the commission I have been getting, that I shall receive a salary of $——— per year, as per my conversation with you.

"Desnoyers Shoe Company,<br>
"W. L. Desnoyers, Pres.

"W. L. Desnoyers."

He handed this document to Dozier, who, after reading it, said, "You seem to have covered the case completely," and thereupon handed him his check for $50,000, payable to the bankrupt. At the same time, Desnoyers gave Dozier a check for $1,316.67 as interest at 6 per cent. on the $50,000 to July 1st. On the following day the $50,000 check was cashed. On June 27, 1911, Dozier received a further check of $516.67, as interest from July 1st to September 1st. Entries covering each of these transactions were made on the general ledger of the bankrupt in an account opened up with Dozier. No other entries appear on this account. The testimony does not show that Dozier had any knowledge of how his account was carried on the company's books.

At a directors' meeting, held February 6, 1911, some question was raised as to the right of Desnoyers to assure Dozier that the stockholders of the company would carry out the agreement. Desnoyers said, in answer to an inquiry of one of the directors as to what would happen if the stockholders failed to increase the stock, that in that event the money would be paid back to Dozier. While Desnoyers' testimony is, in some respects, apparently contradictory and uncertain, it seems clear from his entire testimony that at no time did he and Dozier discuss the possibility of a failure to increase the capital stock, or of any circumstance under which the money should or must be returned. Dozier, because of ill health, did not appear as a witness.

The minutes of the directors' meeting of February 6th show the following resolution: "It was moved and seconded that the president be authorized to advise Mr. L. D. Dozier that the members of the board of directors would be glad to have Mr. Dozier associated with them as a stockholder, and that a proposal to increase the capital stock of the company would be submitted at the next annual meeting of the stockholders of the company. This motion was unanimously carried, all of the directors present voting in favor thereof."

Subsequently Desnoyers gave out the following statement to commercial agencies and to some of the large creditors:

"Statement of the Desnoyers Shoe Company, Jan. 1st, 1911.

"Assets.

| | | |
|---|---:|---:|
| Real estate, machinery, etc..................... | | $230,913.61 |
| Bills receivable............................... | | 2,600.00 |
| Accounts receivable ................ | $88,712.33 | |
| Less doubtful ..................... | 800.00 | 87,912.33 |
| Inventories and prepaid items............... | | 250,941.67 |
| Cash L. D. Dozier................. | $50,000 | |
| Cash ........................... | 11,832.02 | 61,832.02 |
| | | $634,199.63 |

"Liabilities.

| | | |
|---|---:|---:|
| Accounts payable ........................... | $254,539.10 | |
| | 20,000.00 | |
| | | $274,539.10 |

"The real estate item consists of modern brick factory building in Springfield, Ill., with an area of 75,000 square feet of floor space, all thoroughly sprinklered (insurance rate 15 cents per hundred dollars), having a frontage of 320 feet on a paved avenue, by 420 feet on the Wabash Railroad. This is not outlying property, but is well downtown and surrounded on all sides by the homes of working people.

"All the items as listed above were compiled by Price, Waterhouse & Co., and certified by them, except the item of cash listed as L. D. Dozier. This item represents an increase to our capital stock of $50,000.00 paid by Mr. L. D. Dozier of this city. This is to be special capital until the 1st of July, at which time it is the purpose of the company to increase its capital stock from $300,000 to $500,000, and this special capital will then become part of the general fund. Desnoyers Shoe Company,

"W. L. Desnoyers, Pres."

A number of creditors extended additional credit or refrained from pressing their claims in reliance upon this statement. The evidence does not show that Dozier expressly authorized or had any knowledge of the statement. Dozier, Jr., was employed in the business at a salary of $50 a month. No dividends were paid subsequent to January 1, 1911, either to the stockholders or to Dozier. August 2, 1911, the company was adjudicated a bankrupt. In November, 1911, Dozier filed his claim as a creditor in the sum of $50,000 for money had and received as an advance payment for $50,000 par value of the proposed increase of capital stock, basing his right thereto on the failure of the stockholders to authorize the increase, the lack of further subscriptions, the impossibility of further performance by reason of the bankruptcy, and the want of any consideration actually received by him for the amount so paid.

Objection to the claim was filed by the trustee and by one of the large creditors. The order of the referee, allowing the claim, was reversed by the District Judge.

Chas. M. Polk and John F. Lee, both of St. Louis, Mo., for appellant.

William L. Patton and O. S. Humphrey, both of Springfield, Ill., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

MACK, Circuit Judge (after stating the facts as above). The relations between Dozier and the Desnoyers Shoe Company, in our judgment, are to be determined from the written agreement of January 24th. The testimony establishes that this document was intended to embody, and was regarded by the parties as covering, their entire agreement. Claimant correctly alleges that it was ratified by the board of directors, so that we are not now concerned with any question of Desnoyers' lack of authority to enter into this kind of an agreement on behalf of the company. It is to be observed, too, that the document purports to be executed, not only by Desnoyers as president of the company, but also by him in his individual capacity. The consideration for the $50,000, as expressed in the agreement, was, first, to issue stock to that amount to Dozier, as part of a larger increase of stock to be voted after July 1st; second, to pay Dozier an amount equal to any dividend that might be declared on a similar amount of stock after January 1, 1911; third, to pay, in addition, interest at the rate of 6 per cent. until July 1st (subsequently, by implication resulting from the actual payment and receipt, extended to September 1st); fourth, to give the son an opportunity to learn the business.

[1] While both the president and the board of directors of an Illinois corporation are without authority to sell a prospective, but unauthorized, increased issue of stock, and while, therefore, payment made in advance under such a contract could be recovered (Wolf v. Chicago S. P. Co., 233 Ill. 501, 84 N. E. 614, 13 Ann. Cas. 369), the present contract does not fall within the principle of the Wolf Case for several reasons.

Unless the statement that the $50,000 "is to become special capital until such time as we are able to merge it into the general capital stock" is to be entirely disregarded as meaningless, the money cannot be said to have been paid merely as an advance payment on account of the stock to be issued. Even if these words were to be interpreted as indicating a loan to the company until July 1st and such reasonable time thereafter as might be necessary to effectuate the increase of the stock (an interpretation to be hereafter considered), the implied obligation of the company to repay the loan, with the interest thereon, would be an enforceable counter promise for the payment, and, notwithstanding the lack of enforceability of the additional promise to issue the unauthorized stock, would bar a rescission of the agreement on the part of the lender.

[2] Appellant, however, contends that he has a right to rescind, not only under the principle of the Wolf Case, but also because of a total failure of consideration received by him for his $50,000. Inasmuch as the engagement of Dozier, Jr., in the business was deemed by the parties to be a real, and, indeed, an important, element in the transaction, and, as the promise to employ him was an actual partial consideration for the money deal, the failure of consideration is at best but partial, and therefore gives no right of rescission; this remains true, even though Dozier, Jr., may have derived but little, if any, benefit through his employment in a business concern whose condition was so far different from that which his father believed it to be at the time of the

employment and the investment. Moreover, the promise to pay, in addition to interest, a sum equal to dividends on a similar amount of stock was a valuable part consideration for the money payment; and that, too, despite the fact that the company's condition, unknown to Dozier, made it extremely improbable that dividends could be declared.

We need not consider what Dozier's rights would be if he had relied upon fraud or fraudulent misrepresentations as a ground of rescission of the entire contract, inasmuch as no such contention is made. Whatever claim, therefore, Dozier may have against the bankrupt because of the $50,000 advanced by him, the basis thereof is not money had and received and equitably due the plaintiff after a rescission based either on illegality, total failure, or total lack of consideration. The claim as filed was, therefore, properly rejected.

[3] Inasmuch, however, as an amendment of the claim would be allowable, we proceed to consider whether, in any aspect, Dozier has a standing as a creditor of the bankrupt. The document of January 24th discloses clearly that Dozier intended, by handing over the $50,-000, not merely to make an advance payment for the stock to be thereafter issued, but also to give the company the absolute right to use the money for its business until the stock should be issued. Compensation for this use was specifically provided for. Unless there be something contrary thereto in the agreement, such a transaction would be a loan to the company until the issuance of stock, with the right to cancel the indebtedness on the issuance and in payment thereof. If this were the true construction of the agreement, whatever other rights he might have, Dozier would, in any event, be a creditor of the company for the entire $50,000 on a claim for money loaned.

The parties, however, agreed that this $50,000, from the time of payment until it could be "merged into the general capital stock," should become "special capital"; that Dozier should receive therefor, in addition to interest, exactly the same compensation that a stockholder to the extent of $50,000 would receive, namely, dividends. The capital of a stock company or of a business has a well-defined meaning. It is the fund intended to be subject to the risks of the business, the fund contributed to meet the obligations of the business, and to be repaid to the contributors only after all of the other obligations should have been satisfied. While the phrase "special capital," in reference to a corporation, has no established legal meaning, it would seem to be clear that what the parties had in mind was that the $50,000 should be subject to the risks of the business and should enjoy the profits thereof in exactly the same way as the actual capital of the business until such time as it could be legally exchanged for capital stock. In other words, something in the nature of a joint venture was entered upon by Dozier and the company.

If, as between Dozier and the stockholders of the company, the former would be entitled to priority in the distribution of the funds as if he were a lender, by his express agreement he has subjected any such claim to the prior rights of creditors. Advances to individuals and corporations for the very purpose of bettering their financial condition by increasing their assets without correspondingly increasing their liabilities as against other creditors are not uncommon, and there

would seem to be no reason, irrespective of any question of estoppel, for refusing to enforce the agreed subordination of the rights of such a lender to those of other creditors. Wallerstein v. Ervin, 112 Fed. 124, 50 C. C. A. 129. The claim of Dozier was, therefore, properly rejected as against all the other creditors, and, as it is apparent that the assets are insufficient to pay such creditors in full, we need not consider the rights inter sese of Dozier and the stockholders of the company.

[4] While these considerations dispose of the case, it may be well to point out that Dozier would, in any event, be estopped, as against many of the largest creditors; for, while he did not expressly authorize any part of the financial statement in reliance upon which they gave additional credit or refrained from enforcing their demands, the sentence therein that his $50,000 was to be "special capital until the 1st of July" was in exact accordance with the document of January 24th, and was therefore impliedly authorized by him.

The order appealed from will therefore be affirmed.