## WILKINSON v. WALKER.

(District Court, N. D. Texas, Fort Worth Division. December 18, 1923.)

No. 266.

1. **Bankruptcy** ⬅293(2)—**Bankruptcy court has jurisdiction of suit by trustee to recover property transferred.**

The court of bankruptcy *held* to have jurisdiction of a suit by a trustee of a corporation to recover property transferred to its principal owner, whether on the ground of preference or of fraudulent transfer, under Bankruptcy Act, § 70e (Comp. St. § 9654).

2. **Bankruptcy** ⬅142—**Suit by trustee to avoid fraudulent transfer can be maintained only on behalf of creditors whose claims antedate the transfer.**

Under Bankruptcy Act, § 70e (Comp. St. § 9654), providing that "the trustee may avoid any transfer by the bankrupt of his property which

any creditor of such bankrupt might have avoided," and under the statutes of Texas, which provide that a fraudulent transfer may be avoided only by one who was a creditor at the time, to sustain such an action by a trustee, it must be shown that at least one of the present creditors was a creditor when the transfer was made.

3. **Bankruptcy ⚖143(10), 164, 178(2)—Money withdrawn by defendant from fund owned by bankrupt, within four months prior to bankruptcy, held recoverable by trustee.**

Money belonging to bankrupt corporation, which was deposited in bank to the credit of defendant, its principal owner, remained a trust fund, the property of bankrupt, and a sum withdrawn therefrom by defendant within four months prior to bankruptcy, and when bankrupt was insolvent, *held* recoverable by the trustee, either as a fraudulent transfer, or, if bankrupt was indebted to defendant, as a preferential payment.

In Equity. Suit by W. W. Wilkinson, trustee in bankruptcy of the Walker Grain Company, against J. L. Walker. Decree for complainant.

See, also, 292 Fed. 395; 294 Fed. 951.

Suit by the trustee for the recovery of alleged preference and to set aside fraudulent conveyances and to recover property fraudulently conveyed.

Stanley Boykin and H. C. Ray, both of Fort Worth, Tex., for trustee.

Clay Cooke, and J. A. Templeton, both of Fort Worth, Tex., G. A. Stultz, of Wichita, Kan., and W. E. Spell, of Waco, Tex., for defendant.

ATWELL, District Judge. On August 16, 1918, an involuntary petition in bankruptcy was filed against the Walker Grain Company, a corporation. On November 10, 1919, it was adjudicated. It was a Texas corporation, with its principal office and place of business in Fort Worth. The defendant is likewise a resident of Fort Worth.

In his bill the trustee alleges, in substance: The organization of the corporation in 1911. That the defendant was its principal stockholder, and its president, who controlled and dominated its affairs. That since its organization it has, for the purpose of hindering, delaying, and defrauding its creditors, past, present, and future, kept its assets secreted and concealed by various schemes and transfers. That it carried on a grain business, maintained no warehouse or elevator, but bought in carload lots, with draft attached to bill of lading, and would resell and divert such cars. It had no tangible assets and kept itself in a constant state of insolvency and proof against legal process by fraudulently transferring to its president, the defendant, its earnings, either by direct transfers or by ostensible dividends. That one method of such concealment was to keep accounts in the same bank which were so managed that at the close of each day's business the corporation would show an overdraft and the J. L. Walker account would absorb any credit belonging to said corporation. That from said J. L. Walker account there would be transferred, from time to time, enough balances to absorb such overdrafts. That in this manner the corporation kept

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

process proof, and in several cases creditors' garnishments were answered that the corporation account was overdrawn, although in each instance there would be a large balance in the J. L. Walker account. That in this way the creditors became discouraged and did not press their claims, or else made reduced settlements thereof. That in February, 1917, the "J. L. Walker account," which consisted of moneys earned by the corporation, was changed to read "J. L. Walker, Trustee," and a general secret power and authority was given the bank to look to said account to supply all overdrafts and other indebtedness of the corporation, and that it was agreed that no checks should be drawn against said account, save to cover indebtedness to said bank, without the special permission of the bank. That the moneys that went into the "trustee account" were transferred to it by said corporation, and were the earnings of said corporation. That the corporation account was kept in a state of overdraft, and deficiencies were supplied by transfers from the "trustee account," which was in turn replenished from the corporation account. That in June, 1917, the bank permitted the defendant to withdraw $75,000 from the trustee account and to invest the same in Liberty bonds, which bonds were replaced in said bank to continue as collateral to secure the bank against overdrafts and indebtedness of the corporation in the same manner as the trustee account. That there was, at the time of the withdrawal of the said $75,-000, approximately $50,000 more in said trustee account. That from the year 1914 to the filing of the petition in bankruptcy the corporation, while insolvent, while it was indebted and expected to become indebted to a large extent, transferred large sums of money, the exact amount being to the complainant unknown, to the defendant, as the defendant knows, and which was alleged to be $300,000. That a large part of this the defendant invested in real estate particularly described in the bill, taking the title in his own name. That said funds were trust funds, in which the creditors were entitled to share ratably, and that a trust existed on said property in favor of the complainant. That the moneys in the Walker account and in the "trustee account," and the Liberty Bonds, were in reality concealed assets of the corporation, and that defendant was trustee for said corporation and its creditors. That within four months of the filing of the petition in bankruptcy, and while insolvent, the corporation, for the purpose of effectuating and making absolute the fraudulent transfers and concealments aforesaid, and for the purpose of giving the defendant a preference and advantage over the other creditors of said corporation, the defendant being a purported creditor, and with the full knowledge of defendant that said transfers would give him a preference over other creditors, transferred to the defendant the balance remaining in the "trustee account," to wit, $45,000, and transferred also to him the said Liberty bonds of the par value of $75,000. That the defendant has kept the same and refused to turn the same over to the complainant and has thereby secured a greater percentage of his debt than other creditors of the same class. That there were unsatisfied and unsecured debts against the bankrupt, together with administration expenses, in the sum of $150,000.

The bill prayed:

"That he have judgment against the defendant in the capacity in which he sues for the aforesaid sums, with legal interest; that the defendant be compelled to account herein for the sums of money transferred to him by the said corporation as dividends or otherwise, and for such portion of said sums of money as have been invested in the respective parcels of real estate herein described; and that complainant have a foreclosure of his lien against said real estate accordingly."

The defendant by appropriate pleading challenged the jurisdiction of the court, alleged the pendency of suits involving the same matters in both the state and federal courts, denied that the corporation had at any time secreted or concealed any of its assets, admitted the conduct of the grain business, denied that it had no tangible assets, alleged that its capital stock was $25,000 and that at no time since its incorporation have its tangible assets been less than that sum, admitted the keeping of the two accounts in the American National Bank at Fort Worth, but alleged that defendant's account was made up of rents and revenues from his real estate and from stock owned in various other corporations and from oil properties, that the earnings of the corporation were deposited to its own account, except as and when dividends might be declared, or the profits divided, at which time the defendant would deposit his part in his individual account, that no dividend was declared when it had any outstanding indebtedness, and that no dividend had been received by the defendant since beginning of the year 1917; that the corporation had an agreement with the bank whereby it would pay all drafts drawn against it with bills of lading attached, although such payments might overdraw its account, and the defendant authorized said bank to charge such overdraft to his individual account; that such overdrafts would be taken up in a short period, and that the corporation never lost one penny by any such arrangement, and that said arrangement resulted in a net profit to the corporation of $30,000; that the corporation account did not customarily show an overdraft; that it was usually in a sum exceeding its capital stock; that the corporation's business was such that there might be fluctuations in the grain market, and that all grain dealers transacted their business in the name of corporations which they controlled and managed in the same manner that the defendant did; that those who dealt with it knew that they were dealing with a corporation with $25,000 authorized capital stock, and they knew that the defendant was not guaranteeing all of the accounts of the corporation; that the last transaction between the defendant and the corporation was in the spring of 1917; that all of the claims represented by the trustee arose after July, 1918, and that the creditors could not complain of any transaction occurring prior to the time they became creditors; that during all of said times the corporation was solvent; that there were $100,000 deposited by the defendant in the said bank in an account styled "J. L. Walker, Trustee, for the Use and Benefit of the American National Bank"; that this deposit was from his individual account, and not from moneys belonging to the corporation, and was made under an agreement with the bank whereby the bank might look to said account as security for any debts which might be owing to the bank, either by

the defendant as an individual, or by the Walker Grain Company, or by any of the other corporations in which the defendant was interested; said transfer was made solely for the protection of the bank against any indebtedness which the defendant or his numerous corporations might owe to the bank; that by reason thereof the corporation was given a larger line of credit at said bank than it otherwise could have procured; that as a matter of fact, since the spring of 1917, there had been taken from the defendant's individual funds and credited to the corporate funds $30,000 in excess of the amount which had been recredited to the defendant's account; that he did withdraw $75,000, with the permission of the bank, for the purpose of buying Liberty bonds, but that it was his own money, and he invested in Liberty bonds and placed them with said bank under the same agreement as the cash had theretofore stood; that the Liberty bonds were registered in the defendant's name and were not at any time concealed from any one; that there are no lawful or legal claims against the bankrupt's estate capable of proof, and that there are in the hands and possession and control of the plaintiff assets of the corporation of a value in excess of $25,000; that the real estate which the plaintiff described was purchased by the defendant a long time before any of the claims represented by the trustee originated, and that the same was purchased with the defendant's individual funds; that the creditors have no right, title, interest, lien, or claim upon the same; that he had owned same for more than three years prior to the adjudication in bankruptcy; that the Walker Grain Company was doing the largest grain business in the state of Texas, and that there had never been any liquidated and outstanding claims against it; that through a fraudulent conspiracy certain claims were made, but that none of said claims have been proven or allowed in bankruptcy, and are not capable of proof, because unliquidated; that the trustee could not legally disburse any money, if recovered, because no allowable claim had ever been presented for allowance; that, although there had been an adjudication with the corporation, not a single claim had ever been filed, approved, and allowed by the referee in bankruptcy, and that not more than $12,000 will ever be allowed; that the appointment of Trustee Wilkinson is void; that there was no first meeting of creditors; that but for the conspiracy and slanders and libels the corporation would have continued in business, and would have paid all legitimate liquidated claims against it, and would have paid all unliquidated claims against it when same had been properly liquidated; that the trustee conspired with the alleged creditors for the purpose of carrying out this design; that he knew that the claims were without foundation; that all the acts of the referee are void, and of no force and effect, for the reason that the trustee was represented by F. P. Culver, an attorney at law, who is the law partner of the referee. The answer prayed that the bill be dismissed and that the defendant have his costs.

The plaintiff in a supplemental bill, answered the charges of conspiracy, and illegal trustee, and void acts by the referee, and alleged that the state court suits and the federal court suits were over different matters, with different parties; that all claims of the creditors had been filed more than two years prior to the date of the filing of the supple-

mental bill, which was filed on January 6, 1923, and that such claims were pending, either before the referee or before the United States Circuit Court of Appeals for the Fifth Circuit; that the issues as to the claims had been raised in the bankruptcy proceedings and decided adversely to the bankrupt, and that said adjudication was final; that the acts of the referee were valid and legal; that the attack upon the integrity of the complainant and of the creditors was malicious; that Culver was appointed by the referee with the consent of the bankrupt and all parties, including the defendant, and that the referee was in no way interested in any fees, and that the size of the fee to be allowed said Culver would be fixed by the District Judge, and not by the referee, and that such appointment had been discussed with United States District Judge Wilson before being made.

On March 10, 1923, Judge Wilson referred the cause to H. A. Turner, Esq., as master in chancery, "to hear and determine the same and to report to the court his findings of fact and conclusions of law, with recommendations thereon." Such report was filed on the 9th day of October, A. D. 1923. Prior to the filing of such report Judge Wilson had asked the writer to try the case. Seasonably exceptions were filed to the report of the master, and on December 12, A. D. 1923, the cause came on to be heard. Certain corrections were made to the report of the master on the facts. Such report, after the approval of the court, briefly is:

That the Walker Grain Company was incorporated in 1911, with a capital stock of $25,000, divided into shares of $100 each. That the defendant owned 248 of these shares, and his brother owned 1 share and an employee owned 1 share. That in 1915 the following were shareholders: Darby, 10 shares; Joiner, brother-in-law of Walker, 10 shares; wife of Walker, 10 shares; Ivy, brother-in-law of Walker, 10 shares; Ivy, mother-in-law of Walker, 10 shares; and Walker himself, 200 shares. That the defendant was the president, his wife was the secretary and treasurer of the company, and that he and his wife and Darby were the directors. That this status continued until bankruptcy. That the defendant was in the grain business in Forth Worth in the name of the Ivy Grain Company. That in 1904 the name was changed to the Walker Grain Company. That Walker was the sole owner of the business, which he conducted until he incorporated the Walker Grain Company. He was president and general manager, and dominated its affairs and dictated its business policies. He financed it, advancing large sums each year up to 1916; as much as $70,000 being advanced in one year. He took notes for such advances. He withdrew its funds to reimburse himself and divided the profits of the business at the will of himself and the other directors, without any meeting of the board. They acquiesced in and consented to everything he did. That though the corporation kept books and records and accounts, and paid franchise taxes, he dealt with it as though it were his own private business. That the corporation was engaged in buying and selling grain in carload lots, such cars being diverted to the purchaser with bill of lading and draft attached. It did a large business. In 1917 the business reached $27,000,000, and during the busy season of that year drafts would frequently amount to as much as

$100,000 per day. This status continued during the first part of 1918, and this was also true through all the years of 1915 and 1916. The business consisted of making contracts for the purchase or sale of grain to be delivered in the future at a certain price, and a heavy decline in the market price might mean large liabilities, and it was at all times a more or less hazardous business.

The grain company transacted its business with the American National Bank, as did the defendant. Each had an account there. All drafts drawn by persons selling grain to the company were paid through said bank, and all grain sold with draft attached were collected through said bank, and the debits and credits to the account of the company represented the amount of said drafts. In 1917 drafts drawn by it on those who purchased grain from it amounted to more than $13,000,000, while those who sold grain to it through drafts, for something less than that amount. That this system resulted in frequently paying drafts amounting to $100,000 or $200,000 a day, when the company really had no money in the bank, but only credits arising from drafts that it had drawn on purchasers; hence the bank desired security, and the defendant guaranteed it against any overdrafts, or other indebtedness of the company, and the bank required him to keep "so much money" for the payment of any such overdrafts, or other indebtedness. That said bank frequently transferred money from the J. L. Walker account to the account of the Walker Grain Company to cover such overdrafts, and when outgoing drafts were sufficient to cover the overdraft the moneys were transferred back to the account of J. L. Walker, and that from the year 1915 up to February 23, 1917, the books of the bank show that it did almost daily transfer from the said J. L. Walker account to the account of the Walker Grain Company large sums of money, the detail of which was unknown to Walker. This verbal agreement between the bank and Walker was finally reduced to writing in 1915 or 1916.

On February 23, 1917, a change in form, but not in substance, was made in the agreement between the defendant and the bank with respect to the manner of taking care of the overdrafts, and for that purpose a new account was created in said bank in the name of "J. L. Walker, Trustee, for the Use and Benefit of the American National Bank as per Written Agreement," and that on that date $60,000 was deposited in that account, and on April 20, 1917, another deposit was made amounting to $60,000. The first $60,000 was transferred from the personal account of J. L. Walker by his direction. The second $60,000 was made up of $51,500, which was checked out of the Walker Grain Company account by a check of that date payable to J. L. Walker, which check was executed by the "Walker Grain Company, by J. L. Walker, President," for the purpose of having it deposited to that account, though Walker, Carr, and Darby testified that this amount represented payment of loans made by Walker to the company. The other $8,500 of the second $60,000 consisted of a number of checks, which Walker testified were executed to him by the Union Grain Company and deposited by him in said trustee account. This account could not be drawn against by Walker without the permission of the bank, and the bank was given absolute control of the funds therein,

in so far as the paying of any overdrafts or other indebtedness of the corporation to it was concerned.

The bank would not have paid the drafts of the grain company if it had not been for this guaranty and this deposit, and the grain company could not have carried on the tremendous business it was enabled to carry on without the same. On June 15, 1917, the defendant was permitted to use $75,000 of the trustee deposit in purchasing Liberty bonds, which Liberty bonds he put with the bank for the same purpose. This made that account stand $75,000 in bonds and $45,000 in cash.

From February 1 to March 4, 1918, the company made contracts for the purchase of approximately 250,000 bushels of corn with the Gregg Grain Company, Elwood Grain Company, Brunswick Grain Company, Moore-Lawless Grain Company, Fisher Grain Company, and Guthrie Mill & Elevator Company. These companies subsequently became the petitioning creditors in bankruptcy. The company during that same period had other large dealings in grain. The petition for bankruptcy was filed on August 16, 1918, but an adjudication was not had for more than a year afterward, and after such adjudication the Walker Grain Company had no funds on hand and no property, except some office furniture of little value, and except the claims listed in the schedule of assets filed by the bankrupt, upon which the trustee has been able to realize the sum of $1,600. On April 29, 1918, Walker drew, with the bank's permission, $12,500 from the trustee account. On the 6th day of July, 1918, $2,500 was transferred from the trustee account to the account of the Walker Grain Company. On April 24, 1918, $30,000 was drawn from the trustee account and credited to the Walker Grain Company. On November 2, 1918, there was transferred from the trustee account to J. L. Walker the $75,000 worth of Liberty bonds. Each of the transfers from the trustee account to the defendant Walker was made with the knowledge and consent of the bankrupt, and it acquiesced in the same, and the said Walker has never accounted to the trustee for said moneys or Liberty bonds. At said time the bankrupt had practically ceased to do business. Exclusive of said trustee fund, it did not have sufficient assets to pay its debts and was insolvent. Several were claiming indebtedness against it, among whom were the petitioning creditors. On June 20, 1918, its license to do business was canceled by the Food Administrator. On a trial in the United States District Court of the issue of insolvency and the commission of acts of bankruptcy while insolvent, on November 10, 1919, the company was declared bankrupt as of date August 16, 1918; such adjudication being affirmed by the Circuit Court of Appeals on November 10, 1920, and the plaintiff was appointed trustee on February 21, 1921.

The petitioning creditors' claims amounted to more than $100,000, and originated in contracts between them and the company providing for the future delivery of corn to the company, and for the difference between the contract price and the market price. These claims were duly proved in the bankruptcy court, over objection, and later the District Court ordered that any one entitled to object thereto would have such right. Such claims antedated the adjudication. The company,

prior to 1918 had always done a profitable business and had made a great deal of money; the defendant Walker receiving as his part something like $25,000 or $30,000 each of the years 1916 and 1917. When he begun business in 1904 or 1905, neither he nor his wife had any money of consequence. They now own property ranging in value from $350,000 to $700,000. The business of the Walker Grain Company was the principal source of such accumulations.

[1] 1. With reference to the defendant's challenge of the jurisdiction of this court to permit the trustee to sue herein, when there is no diversity of citizenship, he cites Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000. 44 L. Ed. 1175, and Harris v. Bank, 216 U. S. 382, 30 Sup. Ct. 296, 54 L. Ed. 528. Neither of these cases is applicable. The first case was rendered before the amendments to the act which give concurrent jurisdiction to both the bankruptcy court and the state court for preferences and for setting aside fraudulent conveyances and to avoid transfers by the bankrupt. The second case merely holds that Bankruptcy Act, § 70e (Comp. St. § 9654), provides for avoiding such a transfer as a creditor might have avoided. The later case of Flanders v. Coleman, 250 U. S. 223, 39 Sup. Ct. 472. 63 L. Ed. 948, is apparently directly in point, and upholds the jurisdiction of such a suit in this court, even though it should be determined to be an action under section 70e of the Bankruptcy Act.

[2] 2. That portion of the suit which seeks a recovery on the theory that the defendant used the corporation as his agent to carry on his business, in order that he should have no personal liability, and yet reap the fruits of the same, and while so conducting the business received large sums of money, which he converted into real estate described in the petition, is difficult of solution. To support a recovery the plaintiff presents a multitude of authorities, among which are Chicago, etc., v. Minneapolis, 247 U. S. 490, 38 Sup. Ct. 553, 62 L. Ed. 1229; In re Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530; In re Eiler's Music House (C. C. A.) 270 Fed. 915; Ludvigh v. American Woolen Co. (D. C.) 159 Fed. 796; Hunter v. Baker, etc. (D. C.) 225 Fed. 1006; Watson v. Bonfils, 116 Fed. 157, 53 C. C. A. 535; In re Kornit Mfg. Co. (D. C.) 192 Fed. 392; In re Rieger et al. (D. C.) 157 Fed. 609; Wallerstein v. Ervin, 112 Fed. 124, 50 C. C. A. 129; In re Desnoyers Shoe Co., 224 Fed. 372, 140 C. C. A. 58. These authorities, and they may be multiplied, support that very healthy commercial rule that no person or corporation can carry on a business in the name of another entity, and furnish capital therefor, and dominate the same, and receive the profits thereof, without subjecting both the property so accumulated and the capital so furnished to the debts and liabilities of the other concern.

Nor do I have any difficulty in finding and believing that the defendant, in accordance with the master's report, dominated the bankrupt, carried on through it his favorite and succeeding business, and by his advances and guaranties enabled a $25,000 corporation to do an enormous business reaching into the millions, and which it could not have done without his aid. Nor is there any question that the earnings of the corporation were, as soon as they came into being, without formal directors' meetings, appropriated largely by himself and the

nominal stockholders. That he placed a large part of these earnings into real estate may be also conceded. Under section 70e of the Bankruptcy Act, and that is the section under which a recovery could be had, if at all, of such investment and profits, the time of the making of such effort is practically immaterial; rather, what I mean to say is that there is no four-month limitation on such an application. It may go back many years. Cooper v. Penland, 247 Fed. 480, 159 C. C. A. 534; American Trust & Savings Bank v. Duncan, 254 Fed. 780, 166 C. C. A. 226.

But the insuperable obstacle to a recovery under this head by the plaintiff is that the testimony is not sufficiently satisfying as to time, amount, specificness of property, and existence of any creditor at such time. The record discloses that the Walker Grain Company began business in 1904 or 1905, that at that time neither the defendant nor his wife had any money, and that at the present time they are owners of property in the city of Fort Worth ranging in value from $350,000 to $700,000, and that the business of the Walker Grain Company was the principal source of these large accumulations. During what year did he receive these moneys? During what year did he purchase the property described in the petition? Which of his creditors held a claim against him at such particular time?

The Walker Grain Company became a corporation in 1911; that is, the bankrupt. Were these moneys received by him prior to such incorporation? Were the properties purchased by him prior to such incorporation? The last two questions we may answer with a measurable degree of satisfaction, as the record discloses that in 1914, 1915, 1916, 1917, and the beginning of 1918 the business of the company was very large and satisfactory. Were any of the properties purchased during that period? If so, and there were no creditors of the corporation, such purchases are perfectly valid and not subject to the lien sought.

Only such creditors as were in existence at the time of the alleged improper transfers, or at the time of the alleged voidable transaction, are entitled to the benefit of section 70e. Their right is measured by the statutes of Texas by the very wording of section 70e itself:

"The trustee may avoid any transfer by the bankrupt of his property which any creditor * * * might have avoided."

Any *then* creditor must be the reading of the language. In Texas no creditor, who became such after a transfer, or conveyance, can recover the property from the transferee. I do not stop to discuss the possible equity ground supporting a recovery from the transferee of a debtor who made such transfer having in contemplation the making of the debt. That such a creditor is the only person for whom the trustee may make use of this section is irrefutably established by the Circuit Court of Appeals for this circuit, in an opinion by Circuit Judge Walker in American Trust, etc., v. Duncan, 254 Fed. 780, 166 C. C. A. 226. In that case a bankrupt, years before bankruptcy, gave his wife $1,000. At that time the bank was the only creditor. After the donor went into bankruptcy, the trustee sued to recover the gift. It was recovered. The bank asked to have exclusive benefit of such recovery. Other creditors contested. Judge Walker said:

"Under the circumstances disclosed in the instant case, the appellant alone [bank] had the right to subject to the satisfaction of its demand against the bankrupt the property of the bankrupt's donee in which the sum donated was invested."

In other words when we stop and consider the justice and equity of such a recovery, we instantly see that no creditor, nor creditors, other than those existing at the time, could or should have any such right. Persuasive—perhaps a stronger word should be used—of this position is the case of Martin v. Commercial, etc., 245 U. S. 513, 38 Sup. Ct. 176, 62 L. Ed. 441, in that it directs the mind to the fact that individuality has a place in the assertion of rights that arise under insolvency and bankruptcy statutes. All of the creditors, except the telephone company, which has not proven its claim in bankruptcy, and which is proceeding on its individual way to collect, find the basis of their complaints, or accounts, or claims, on contracts made between February 1 and March 4, 1918. Such contracts were for approximately 250,000 bushels of corn to be delivered in the future. The breaking of such contracts, the refusal to go forward with them, the ascertainment of the difference between the contract price of the corn and the market price on the date of such refusal or cancellation, gave the figures making the amount and age of such claim and claims against the bankrupt. This date was "on or before June 20, 1918, except in the Brunswick Company claim, which was canceled on June 22, 1918." As a matter of fact all of the refusals under these contracts, and the cancellations thereof were either the latter part of May, 1918, or June or July of 1918. There is no testimony in the record showing a transfer of any money or property or any profits after that date, except as treated in the next paragraph of this opinion. A recovery, therefore, of any portion of the $120,000 alleged to have been deposited in the account of "J. L. Walker trustee," or for the guaranteeing of the drafts of the Walker Grain Company and the protection of the bank against the overdrafts of the Walker Grain Company, must be held to have been individual property of the defendant, at the time of such deposit, so far as the right of recovery under this section is concerned, unless there be some part of such $120,000 that is shown to have been the property of the bankrupt.

I reach these conclusions for the defendant without the assistance of the reasoning in the cases of Scharbauer v. Lampasas County (Tex. Com. App.) 235 S. W. 533; Staacke v. Routledge, 111 Tex. 489, 241 S. W. 994; American Salt Co. v. Heidenheimer, 80 Tex. 344, 15 S. W. 1038, 26 Am. St. Rep. 743; White v. Pecos, etc., 18 Tex. Civ. App. 634, 45 S. W. 207; Pullman Co. v. Railway, 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499; Snider's Sons Co. v. Troy, 91 Ala. 224, 8 South. 658, 11 L. R. A. 515, 24 Am. St. Rep. 887; Peterson v. C., R. I. & P., 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841; P. & N. T. Ry. Co. v. Cox, 106 Tex. 74, 157 S. W. 745; College Park Belt Line v. Idle & Son, 15 Tex. Civ. App. 273, 40 S. W. 64. Such cases display the propositions that, even though a corporation may have been fraudulently organized, there could be no holding of stockholders as partners, and, further, that creditors having dealt with the de facto corporation will not be heard to attack or question its responsibility, nor to sub-

stitute the responsibility of the persons responsible for its existence and conduct. I am finding, it will be noted, for the defendant on these issues, without attempting to excuse him on the basis of the last authorities.

[3] 3. The agreement between the defendant and the bank for the protection of the overdrafts and the indebtedness of the bankrupt was reduced to writing in 1915, and is as follows:

"Fort Worth, Texas, Nov. 9, 1915.

"The American National Bank, Fort Worth, Texas—Gentlemen: In consideration of the accommodations you are rendering the Walker Grain Company, the Officer-Smith Grain Company, the Union Grain Company, and myself as manager and largely the owner of said companies, in the way you are handling our accounts with you and in connection with certain drafts on us, and in other particulars, and in view of the fact that some of our accounts may become overdrawn, or we may otherwise become obligated, or indebted to you: Now, therefore, this is to witness that I hereby personally guarantee any overdraft or other obligations, liability, or indebtedness to you which may at any time be created or exist against said companies or either of them; and in addition you may, at any time that you might become uneasy about any of their overdrafts, liabilities, or indebtedness to you, charge same to my personal account, or appropriate my balance on any such liabilities, indebtedness, or overdrafts.

"Witness my hand this 10th day of November, 1915.    J. L. Walker."

On February 23, 1917, a change in form and not in substance was made in the agreement between Walker and the bank with respect to the manner of taking care of the overdrafts referred to in the preceding paragraph. This new agreement merely gave the bank the actual cash rather than the written guaranty, but the purpose was the same. The defendant deposited in an account with said bank to the credit of "J. L. Walker, Trustee, for the Use and Benefit of the American National Bank, as per Written Agreement," $60,000. Under the views expressed in the foregoing paragraph, this was his individual money, and not subject to recovery by the trustee. On April 20, 1917, another deposit of $60,000 was made in said account. It arose from a check for $51,500 issued on that date to J. L. Walker by the "Walker Grain Company, by J. L. Walker, President." The other $8,500 consisted of a number of checks, which Walker testified were executed to him by the Union Grain Company, another corporation which he controlled. The defendant, and Carr, and Darby, the latter two being connected with the defendant in some way, testified that the $51,500 check was to pay loans that Walker had made to the bankrupt; but it was not so found by the master, even though the master's report, as amended by the court, contains this phrase:

"Though Walker, Carr, and Darby testified that this sum paid loans made by Walker to the Walker Company."

My opinion is that a careful study of the record in this case drives one to the conclusion that this $51,500 was the property of the bankrupt. Later $32,500 of the $120,000 was indisputably paid on claims of the bankrupt to creditors other than the defendant. On November 2, 1918, after the filing of the petition in bankruptcy, the defendant withdrew $75,000 worth of Liberty bonds, which were purchased out of the $120,000, having previously drawn $12,500 of said $120,000. These three items aggregate $120,000.

I hold that on November 2, 1918, the $51,500, which was in the name of "J. L. Walker, Trustee," and which was appropriated by the defendant, was a trust fund belonging to the bankrupt; that said $51,500, less $32,500, confessedly paid on proper indebtedness of the bankrupt, is the amount that the defendant appropriated to his own use and benefit, and still withholds from the trustee. It is quite immaterial whether he had loaned that money to the bankrupt, or whether the bankrupt paid it to him. If such were the case, it would still have been a preference. The amount, therefore, which the trustee is entitled to recover, is the sum of $19,000, with interest from November 2, 1918, at 6 per cent. The recovery cannot be larger on the theory that the defendant mingled with his $68,500 the $51,500, since each amount is well known.

The date of this transaction, and the view taken of the ownership of this fund, and the condition of the bankrupt at such time, authorizes this recovery under either of the three statutes; i. e., subdivision b of section 60, Bankruptcy Act, subdivision e of section 67, or subdivision e of section 70 (Comp. St. §§ 9644, 9651, 9654).

This recovery is not entitled to be aided by the foreclosure of any lien upon any property mentioned in the bill. The exceptions and pleas of the defendant are overruled.

Judgment will be drawn accordingly.